UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

-------------------------------------------------------x
In re:                                   :    Case No. 20-51998-AMK
                                         :
        GRANT THOMAS WILCOX,             :    Chapter 13
                                         :
                                         :
          Debtor.                        :
                                         :
-------------------------------------------------------x
                                         :    Adv. Pro. No. 21-5001
GRANT T. WILCOX,                         :
                                         :
        Plaintiff,                       :    Judge Alan M. Koschik
                                         :
             v.                          :
                                         :
SARA N. WILCOX n/k/a SARA BUTTS, *et al.* :
                                         :
        Defendants.                      :
-------------------------------------------------------x

## <u>ANSWER OF SARA BUTTS AND HERBERT BAKER AND<br>COUNTERCLAIMS OF SARA BUTTS</u>

Now come Sara Butts f/k/a Sara Wilcox and Herbert Baker ("Defendants") by and through

their undersigned counsel and hereby submit their Answer to Plaintiff's Complaint (Doc. No. 1).

For their answer, Defendants state as follows:

1.      The allegations contained in paragraph 1 of Plaintiff's complaint are a statement of purpose and require no answer; provided however, Defendants deny the allegations contained in paragraph 1 of Plaintiff's Complaint.

2.      The allegations contained in paragraph 2 of Plaintiff's complaint are a statement of purpose and require no answer; provided however, Defendants deny the allegations contained in paragraph 2 of Plaintiff's Complaint.

3.      The allegations contained in paragraph 3 of Plaintiff's complaint are a statement of purpose and require no answer; provided however, Defendants deny the allegations contained in paragraph 3 of Plaintiff's Complaint.

4.      Defendants admit the allegations contained in paragraphs 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16.

5.      Defendants deny the allegations contained in paragraph 17 of Plaintiff's Complaint, however, pleading affirmatively, Defendants state that the Domestic Relations Court held a hearing on December 30, 2019, at which the Defendants attended pursuant to the Domestic Relations Court's Order.

6.      Defendants admit the allegations contained in paragraphs 18, 19, and 20.

7.      Defendants deny, for lack of knowledge or information sufficient to for a belief, the allegations contained in paragraph 21, however, pleading affirmatively, Defendants state that Defendants never threatened Plaintiff regarding visitation and admit that Plaintiff dismissed his prior chapter 13 case number 19-53018.

8.      Defendants deny the allegations contained in paragraph 22 of Plaintiff's Complaint, however, pleading affirmatively, Defendants did offer $30,000 as a global settlement amount for all financial disputes between the Plaintiff and Defendants.

2

9.      Defendants admit the allegations contained in paragraphs 23 and 24 of Plaintiff's Complaint.

10.      Defendants deny, for lack of knowledge or information sufficient to form a belief, the allegations contained in paragraph 25 of Plaintiff's Complaint.

11.      Defendants admit the allegations contained in paragraph 26 of Plaintiff's Complaint.

12.      Defendants deny for lack of knowledge or information sufficient to form a belief, the allegations contained in paragraph 27 of Plaintiff's Complaint.

13.      Defendants deny the allegations contained in paragraph 28 of Plaintiff's Complaint, however, pleading affirmatively, Plaintiffs state that Defendant was stopped by police as evidenced by Exhibit A attached hereto.

14.      Defendants deny the allegations contained in paragraph 29 of Plaintiff's Complaint, however, pleading affirmatively, Defendants state that local police did visit Plaintiff's home as evidenced by Exhibit B attached hereto.

15.      Defendants deny for lack of knowledge or information sufficient to form a belief, the allegations contained in paragraph 30 of Plaintiff's Complaint.

16.      Defendants deny the allegations contained in paragraph 31 of Plaintiff's Complaint, however, pleading affirmatively, Defendants state that Plaintiff was again visited by local police ads evidenced by Exhibit C attached hereto.

17.      Defendants deny the allegations contained in paragraphs 32 and 33 of Plaintiff's Complaint.

## AFFIRMATIVE DEFENSES

1.     Defendants incorporate as if fully rewritten herein, all of their admissions, denials, and affirmative pleadings as set forth in paragraphs 1 through 17 of their Answer.

2.     Plaintiff's claims set forth in his Complaint are barred by the doctrines of waiver, estoppel, and laches.

3.     Plaintiff's Complaint fails to state a claim upon which relief can be granted.

4.     Plaintiff has failed to join all parties necessary for a complete adjudication of the claims asserted in Plaintiff's Complaint.

5.     Defendants reserve the right to supplement their Answer and defenses once discovery is completed.

## COUNTERCLAIM
## COUNT I

1.     Defendant Counterclaimant Sara Butts incorporates all of her admissions, denials, and affirmative pleadings of her Answer as if fully rewritten herein.

2.     Plaintiff and Defendant were parties to a divorce action in Licking County Ohio (the "Divorce") styled as Wilcox v. Wilcox, Case No. 2015-DR-00574.

3.     The court in the Divorce entered an order dated March 23, 2017, granting the parties a divorce and dividing their marital property.

4.     The divorce decree awarded Defendant-counterclaimant ½ of Plaintiff's retirement account (the "Property") and ordered the Plaintiff to submit a qualified domestic relations order ("QDRO").  See divorce decree attached hereto as Exhibit D at pp. 38-39.

5.     Contrary to the terms of the divorce decree, Plaintiff liquidated and used the Property for his own benefit between April 1, 2017, and June 30, 2017.  See Exhibit E attached hereto.

6.     Plaintiff obtained the Property by false pretenses, a false representation, or fraud.

4

7.     The debt owed to Defendant-counterclaimant based upon is not dischargeable pursuant to 11 U.S.C. § 523(a)(2).

## COUNT II

8.     Defendant Counterclaimant Sara Butts incorporates all of her admissions, denials, and affirmative pleadings in her Answer and paragraphs 1 through 7 of her counterclaim as if fully rewritten herein.

9.     Plaintiff had possession and control over the Property lawfully as his separate retirement account until the domestic relations court entered the divorce decree.

10.     At that point in time the Property became property of Defendant Counterclaimant.

11.     Plaintiff liquidated the Property and used it for his own purposes thereby embezzeling the Property.

12.     The debt owed to Defendant-counterclaimant is not dischargeable pursuant to 11 U.S.C. 523(a)(4).

WHEREFORE, Sara Butts, f/k/a Sara Wilcox, and Herbert Baker having fully answered, respectfully requests that the Court: (i) dismiss Plaintiff's Complaint; (ii) grant a judgment against Plaintiff and in favor of Defendant Counterclaimant Sara Butts that the debt owed to her for the division of Plaintiff's retirement account be determined not dischargeable pursuant to 11 U.S.C. § 523(a)(2); (iii) grant a judgment against Plaintiff and in favor of Defendant Counterclaimant Sara Butts that the debt owed to her for the division of Plaintiff's retirement account be determined not

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

5

dischargeable pursuant to 11 U.S.C. § 523(a)(4); and (iv) grant any other and further relief that the

Court deems just and proper.

Respectfully submitted,

/s/ Anthony J. DeGirolamo
Anthony J. DeGirolamo (0059265)
3930 Fulton Dr., N.W., Ste. 100B
Canton, Ohio 44702
Telephone: 330-305-9700
Facsimile: 330-305-9713
E-mail: tony@ajdlaw7-11.com

COUNSEL FOR SARA BUTTS
f/k/a SARA WILCOX AND
HERBERT BAKER

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2021, a copy of the foregoing Answer was electronically transmitted via the Court's CM/ECF system to those listed on the Court's Electronic Mail Notice list:

- Keith Rucinski    efilings@ch13akron.com
- United States Trustee    (Registered address)@usdoj.gov

/s/ Anthony J. DeGirolamo
Anthony J. DeGirolamo

The undersigned hereby certifies that a copy of the foregoing Answer was served regular U.S. Mail, postage prepaid, upon those listed below, this 5th day of February, 2021.

/s/ Anthony J. DeGirolamo
Anthony J. DeGirolamo

Grant T. Wilcox
9858 Green Drive
Windham, Ohio 44288-1419

**EXHIBIT A**

**EXHIBIT B**



# Windham PD

## Incident Report

**Windham PD**

9083 North Main St.
Windham, OH 44288
Phone: (330)326-2211
Fax: (330)326-3398

Released by
Windham Police Dept.

Incident #: **W202001157**  Report Date: **Thursday, December 17, 2020**

### Incident Information

| | |
|---|---|
| Call Type: | **PSYCHIATRIC SITUATION** |
| Location: | 9858 GREEN DR  WINDHAM  Zone: |
| Occurred Between: | 12/17/2020  13:05:00  And  12/17/2020  13:05:00 |
| Supervisor: | 705 Dale Korman  Unit on Scene: 727/725/71 |
| Officer Report: | 727 Eldin Beganovic  Officer Assigned: 727 Eldin Beganovic |
| Boards: D, C or J: | Copies To: |
| Approved By: | Dale  Korman  Approved Date: 12/18/2020 |
| Clearance Code: | J  - CLOSED |

### Dispatch Times

Received: 13:05  Dispatched: 13:05  Arrived: 13:14  Cleared: 15:56  Total: 2:51

### Incident Names

| Entry Type | | |
|---|---|---|
| **SUB** | Name: WILCOX, GRANT THOMAS | DOB: 05/23/1988 |
| | Address: 9858 GREEN DR  WINDHAM, OH 44288 | Phone1: |
| | Sex: M  Race: W  Hgt: 6  2  Wgt: 400  Hair: BRO  Eyes: BLU | Phone2: |

| Entry Type | | |
|---|---|---|
| **OIV** | Name: WILCOX, THOMAS | DOB: 09/25/1958 |
| | Address: 641 STATE ROUTE 303  , OH | Phone1: |
| | Sex: M  Race: W  Hgt: 0  0  Wgt: 0  Hair:  Eyes: | Phone2: |

| Entry Type | | |
|---|---|---|
| **OIV** | Name: VANDERBLUM, BARB | DOB: |
| | Address: 9859 GREEN DRIVE  WINDHAM, OH | Phone1: |
| | Sex: F  Race: W  Hgt: 0  0  Wgt: 0  Hair:  Eyes: | Phone2: |

### Narrative Report

On 12/17/2020 at approximately 1305 hours, Officer Beganovic and Officer Lyashko were dispatched to 9859 Green Drive in reference to a 911 hang-up. Dispatch advised that screaming could be heard from the call and that there had been a history of 911 hang-ups at that location. Upon arrival, Officer Beganovic made contact with the home owner of 9859 Green Drive, Barb Vanderblum. Officers advised Vanderblum that a 911 hang-up was plotted at her residence and asked if she was the one who called. She stated that she did not call 911. Vanderblum advised officers that they could search her residence to prove no one else was there. With a search of the residence, no other individuals were found. Vanderblum stated that the caller could have possibly been Grant Wilcox.

At approximately 1317, Sergeant Garinger arrived on scene. Sergeant Garinger advised to the other officers that he believes that the caller was Grant Wilcox. Wilcox lives across the street from 9859 Green Drive, at 9858 Green Drive. Upon confirmation from dispatch, it was found that the initial caller number was in fact that of Grant Wilcox. Officer Beganovic apologized to Vanderblum for the inconvenience, in which she replied to with understanding. According to Sergeant Garinger, Wilcox came to the police department earlier in the day in reference to a report for a traffic stop that was conducted on him the night before. Sergeant Garinger believed that Wilcox was making an attempt to mess with the police by calling in a 911 hang-up.

Upon approach of 9858 Green Drive, Officer Beganovic and Officer Lyashko could hear yelling from the residence.



# Windham PD

Released by
Windham Police Dept.

Windham PD

9083 North Main St.
Windham, OH 44288
Phone: (330)326-2211
Fax:    (330)326-3398

## Incident Report

Incident #:   **W202001157**

Report Date:   **Thursday, December 17, 2020**

Wilcox's vehicle was parked in the driveway. Officers knew that he was home. Dispatch advised officers that Wilcox called dispatch again, stating that he paid "the ransom", thanked dispatch, then hung-up. Officers knocked on both front and back doors for over ten minutes. Numerous attempts were made to speak with Wilcox, but no answer. Officers continued to hear Wilcox talking to someone. Officer Lyashko was positioned in the rear of the residence while Officer Beganovic and Sergeant Garinger were positioned in the front. Officer Beganovic decided to stand below the living room window in an attempt to hear Wilcox. Wilcox seemed to be on the phone with an unknown individual. Officer Beganovic heard Wilcox say the following: "They are surrounding me. There are Windham and Garrettsville officers all over my house", "They are here to get me for the warrant", "I have to pay for what I did to my son and my wife", "I'm going to end it". Wilcox said many other things but Officer Beganovic could not understand due to the barrier between the two. Wilcox made a reference to some sort of protocol. Wilcox stated, "Start the Omega Protocol". Officer Beganovic did not know what to make of this, and advised other units of what he heard. Sergeant Garinger contacted the prosecutors office and spoke with Prosecutor Michniak. Wilcox has a warrant out of Licking County for Failure to Appear to Jail/Contempt of Court. Based on information gathered to this point, Michniak advised that if Licking County would not take Wilcox on the warrants, then we would be able to pink-slip Wilcox. Based on the possibility of self-harm, Sergeant Garinger made the call to enter the residence. Dispatch requested mutual aid for the Windham Officers. Garrettsville and Portage County Sheriffs Office were requested. At approximately 1355 hours, Garrettsvile Officers arrived on scene.

At approximately 1358 hours, entry was made into the residence at the front door. Both Windham and Garrettsville officers entered the residence and found Grant Wilcox sitting on a chair in his living room. As officers cleared the residence, Sergeant Garinger detained Wilcox. Wilcox was only wearing underwear. After speaking with Wilcox, officers determine that he is not in state of normality. Wilcox questioned why officers were harrassing him, and that he knew we were there for his warrant. After advising Wilcox of their actual intentions of making sure he was safe, he dismissed the police. Wilcox stated that police were violating his rights by entering his property without his permission and that he would pursue damages. Sergeant Garinger advised Wilcox that he had ample opportunities to open the door and speak with police to make sure he was okay. Wilcox claims he never knew we were outside, and that he did not hear us. At approximately 1410 hours, Windham Fire and PCSO deputies arrived on scene. Wilcox answered all of the fire personnel questions. Multiple officers identified a Jack Daniels Whisky bottle in the kitchen, empty. There was a whisky glass on the night stand next to where he was sitting. When asked for a blood sugar sample, Wilcox refused. Wilcox stated that since his hands were handcuffed behind him, the hands were not in his presence. With this, he claimed fire personnel had no right to take his blood. Wilcox advised officers that if they un-cuffed him, and cuffed him in the front, they could take his blood sugar. He was advised that he would not be cuffed in the front. Wilcox began to become more agitated than before. He began to lash out at police and fire personnel. Wilcox dismissed much of what they had to say and began having vulgar language. Wilcox stated that he wanted to die. He stated that he wanted it to end, and that his life was "worthless". Wilcox was advised that he would be taken to the hospital and pink-slipped. Wilcox decided to lean back, and rest his head on his living room night stand. Wilcox softly tapped his head on the stand once. Immediately after the first, he did it again. Suddenly he aggressively banged his head on the stand as hard as he could. Fire and police personnel grabbed his head so he would not cause any more damage to himself. Fire asked Wilcox where he would like to be taken to be evaluated. Wilcox stated that he did not care and that he "wanted to go for a ride". Wilcox eventually decided to be taken to UH Portage County Ravenna.

With the help of fire personnel, Wilcox stood up on his own. Wilcox was given the opportunity to use the restroom before he was taken. As Wilcox was escorted outside, he walked right past the cot he was supposed to lay on and started walking towards his driveway. Sergeant Garinger and Officer Beganovic grabbed Wilcox by the arms and tried to stop him from moving. Wilcox then began to fight with officers while screaming profanities to the neighbors and police officers. Wilcox continued to scream and resist for approximately one minute until he calmed down and sat in the cot. Once Wilcox was secured to the cot, his father arrived on scene. His father is Thomas Wilcox.



# Windham PD

Windham PD

9083 North Main St.
Windham, OH 44288
Phone: (330)326-2211
Fax: (330)326-3398

## Incident Report

Incident #: **W202001157**     Report Date: **Thursday, December 17, 2020**

Thomas motioned to Officer Beganovic to explain to him what had happened. After advising Thomas of the events with Grant, Thomas advised Officer Beganovic that he was happy his son was going to the hospital to get some help. Thomas stated to Officer Beganovic that Grant was sending his wife strange text messages and that was the reason why he came to see him. The entire time that Officer Beganovic and Thomas Wilcox spoke, Grant Wilcox's gaze was locked onto his father. Grant repeatedly yelled, "Don't listen to a word that cock sucker says". Once Grant was loaded into the squad, Officer Lyashko accompanied with them. Sergeant Garinger called dispatch and advised that he needed someone to come board up the door that was destroyed when entry was gained. Officer Beganovic went back to Windham Police Department to fill out a pink-slip for Grant Wilcox. After filling out the form, Officer Beganovic drove to UH Portage County Ravenna. Officer Beganovic was advised that Wilcox was still being combative at the hospital while other patients also began to fight. Officer Beganovic rushed to the hospital to deliver the pink-slip and help University Hospital Police with the other patient.

Upon arrival, the fights were no more. Wilcox was in the hospital bed, detained. Officer Beganovic gave the pink-slip to the registered nurse. After UH Police strapped Wilcox to the bed, Officer Beganovic and Officer Lyashko retrieved the handcuffs used to detain Wilcox at his residence. Officer Beganovic and Officer Lyashko were relieved and went back to the Windham Police Department. At approximately 1615 hours, Officer Novak advised dispatch that Wilcox's residence was secured by Allen Keith Construction Company.

Report By: _____     Date: _____

Supervisor: _____     Date: _____

Entered By: _____     Date: _____

Approved By: _____     Date: _____

Released by
Windham Police Dept.

**EXHIBIT C**



# Windham PD

Windham PD

9083 North Main St.
Windham, OH 44288
Phone:  (330)326-2211
Fax:     (330)326-3398

Released by
Windham Police Dept.

## Incident Report

Incident #:  **W202100021**    Report Date:  **Friday, January 8, 2021**

### Incident Information

| | |
|---|---|
| Call Type: | **WELFARE CHECK** |
| Location: | 9858 GREEN DR    WINDHAM    Zone: |
| Occurred Between: | 01/08/2021   11:29:00   And   01/08/2021   11:29:00 |
| Supervisor: | 701 Eric Breiding |
| Officer Report: | 701 Eric Breiding |
| Boards:  D, C or J: | |
| Approved By: | Dale   Korman |
| Clearance Code: | K  - UNFOUNDED |

Unit on Scene:  701 / 713
Officer Assigned:  713 Richard Garinger
Copies To:
Approved Date:  01/11/2021

### Dispatch Times

Received:  11:29    Dispatched:  11:33    Arrived:  11:45    Cleared:  11:45    Total:  0:16

### Incident Names

| Entry Type | Name: | , BRANDY | DOB: | 01/01/1900 |
|---|---|---|---|---|
| COM | Address: | 0 | Phone1: | |
| | Sex:   Race:   Hgt: 0  0  Wgt: 0  Hair:   Eyes: | | Phone2: | |

| Entry Type | Name: | WILCOX, GRANT THOMAS | DOB: | 05/23/1988 |
|---|---|---|---|---|
| SUB | Address: | 9858 GREEN DR   WINDHAM, OH 44288 | Phone1: | |
| | Sex: M  Race: W  Hgt: 6  2  Wgt: 400  Hair: BRO  Eyes: BLU | | Phone2: | |

### Narrative Report

On 01/08/2021, at approximately 1132hrs, Chief Breiding and Sgt. Garinger responded to 9858 Green Dr. to conduct a welfare check on the resident, Grant Wilcox.  Dispatch advised that they had received a call from a Brandy at the Licking County Child Support Office.  Brandy indicated to dispatch that during a phone conversation she was having with Wilcox about his child support order, he stated that "he was going to kill himself" and asked "if that made her happy".

Upon arrival to the residence, Breiding and Garinger found no vehicles in the driveway, and after several minutes of knocking, received no response at the door.  Looking into the windows of the residence, officers observed nothing that appeared out of the ordinary.  A neighbor reported to Garinger that Wilcox had left earlier this morning, and though that he may possibly be headed to his fathers residence in Streetsboro, Ohio.  Streetsboro PD was advised , and they also attempted a welfare check at the father's residence in their city, however Wilcox was not present there either.

| | | | |
|---|---|---|---|
| Report By: | _____ | Date: | |
| Supervisor: | _____ | Date: | |
| Entered By: | _____ | Date: | |
| Approved By: | _____ | Date: | |

Released by
Windham Police Dept.

**EXHIBIT D**

# Court of Common Pleas, Licking County, Ohio

## Domestic Relations Division

**SARA N. WILCOX**
9268 MULBERRY ROAD
MOUNT PERRY, OH 43760
DOB: ▮▮▮▮▮
      PLAINTIFF,

    vs

**GRANT T. WILCOX**
641 STATE RTE 303
STREETSBORO, OH 44241
DOB: ▮▮▮▮▮
      DEFENDANT.

**Case No. 2015 DR 00574**

**JUDGE DUKE FROST**

## JUDGMENT ENTRY-DECREE OF DIVORCE

This matter came before the Court upon the Plaintiff's complaint. The Defendant filed an answer and counterclaim. The matter proceeded to hearing on February 23, 2017. Both parties were represented and present with counsel. Both parties presented testimony and exhibits. Stipulations were entered into between the parties as to certain facts.

On March 16, 2017, the Plaintiff filed a proposed divorce decree, and proposed findings of facts and conclusions of law. Defendant failed to file any pleading.

Based upon the competent, credible evidence admitted into the record, and or stipulations between the parties, the Court finds all of the following:

The parties were married on August 13, 2010.

There was one child born during the marriage who is the issuance of the parties, namely;

▮▮▮▮▮▮▮, DOB: ▮▮▮▮▮▮

The Plaintiff was a resident of the State of Ohio for at least six months and the County of Licking for at least ninety days prior to the filing of the complaint.

The pleadings were duly served according to law.

Judge
Richard P. Wright

Judge
Duke Frost

Magistrate
C. William Rickrich

Magistrate
Ann E. Snyder

Magistrate
Deborah G. Lang

Magistrate
Tracy F. VanWinkle

That proper notice of the hearing was given to the parties.

The Plaintiff is not currently pregnant.

The Court finds that neither party is a debtor, creditor, nor otherwise a party to any action filed under the United States Bankruptcy Code.

The Court finds that neither party is a member of the United States Military and/or subject to the Servicemembers Civil Relief Act, or in the alternative, waives the same and finds there is no impediment to the trial taking place today.

The Court finds that the parties are incompatible, and the parties so stipulated, and there is credible evidence to support said grounds.

The Court finds that it is vested with subject matter jurisdiction pursuant to Ohio Revised Code Section 2301.03(S) as well as in persona jurisdiction over the parties.

The Court finds that venue is proper in Licking County, Ohio. It is therefore **ORDERED, ADJUDGED and DECREED** as follows:

## I.    DURATION OF MARRIAGE

The period of "during the marriage" of the parties as defined in Ohio Revised Code Section 3105.071 is found to encompass the dates of August 13, 2010, through the date of the final hearing, being February 23, 2017. This is consistent not only with the testimony presented in this case, but agreed upon in the stipulations between the parties.

## II.    GROUNDS

Based upon the testimony presented and/or stipulations entered into by the parties, the parties are found to be incompatible. There was evidence that the parties are living separate and apart and are not able to get along in the fashion of a husband and wife. This is consistent not

2

only with the testimony presented in this case, but agreed upon in the stipulations between the parties.

The parties are granted a judgment of divorce against the other on the basis of incompatibility and the marriage of the parties is dissolved.

## III.   ALLOCATION OF PARENTAL RIGHTS AND RESPONSIBILITIES

### A. Residential Parent Status

Based upon the testimony presented and/or stipulations entered into by the parties, the Court hereby finds that it is in the best interest of the child (⬛⬛⬛⬛ DOB: ⬛⬛⬛) that the Plaintiff be designated the residential parent, sole legal custodian and guardian of the children. The Defendant is designated the nonresidential parent.

The Court has considered Ohio Revised Code Section 3109.04 and specifically the factors set out in Ohio Revised Code Section 3109.04(F)(1)(a-j) when making this determination.

(a) The wishes of the child's parents regarding the child's care: The Court has considered the wishes of the parents regarding their child. Plaintiff wants to be the residential parent. Defendant testified towards the end of the trial that he had no objection to the Plaintiff being designated the residential parent. Neither party requested shared parenting. The Court gave this factor significant weight.

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court: Neither party requested the Court to interview the child. The Court considered this factor and gave it no weight.

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest: The parties presented evidence as to their own involvement with their child as well as their family and friends. This included members of the Plaintiff's family such as her sister (Aaron Romine), her brother-in-law (Edward Romine), her niece (Elizabeth Romine) and her grandparents (Donald &

3

Valerie Butts), her sister (Emily Hill) and her mother (Rebecca Hill). Defendant failed to testify about his family, but other testimony showed that his mother (Kim Wilcox) had regular positive contact with the child. The Court considered this factor and gave it significant weight.

(d) The child's adjustment to the child's home, school, and community: Evidence was presented that the child is not enrolled in any school or daycare. However, the child does have about an hour and half for transportation based on the temporary parenting orders. Plaintiff testified based on the current visitation schedule and travel distance, the child is usually very tired and agitated after her visitation with the Defendant. The child is otherwise well adjusted to her environment and community. The Court considered this factor and gave it weight.

(e) The mental and physical health of all persons involved in the situation: Plaintiff testified that both she and the Defendant have had gastric bypass surgery. Defendant has also had sleep apnea issues and Plaintiff believes he suffers from depression. She also testified that the Defendant has a problem abusing alcohol. Plaintiff suspects that the Defendant is abusing prescription medication. A voluntary drug test was taken by both parties at the time of the hearing and both tested negative for various controlled substances. The Court considered this factor and gave it weight.

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights: Defendant alleged that Plaintiff denied parenting time on two separate occasions. Plaintiff acknowledged that she denied visitation on two separate occasions but explained this was after Defendant had been arrested on various felonies; Plaintiff believed Defendant was incarcerated during this period. The Court considered this factor but gave it limited weight.

(g) Whether either parent has failed to make all child support payments, including all arrearages that are required of that parent pursuant to a child support order under which that parent is an obligor: Plaintiff testified that the Defendant is behind on the child support owed pursuant to the temporary orders. The Court considered this factor and gave it limited weight.

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded

4

guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child: Plaintiff argued that the Defendant pled guilty to telephone harassment in which she was the victim of in Licking County Municipal Court Case Number 2016 CRB 0049. Plaintiff testified that Defendant had called and left threatening messages about herself and her grandfather. Plaintiff believed that Defendant was intoxicated during this period. She also testified that in December of 2014, while she was pregnant with their child, the Defendant became upset and knocked over a Christmas tree. Plaintiff attempted to leave the residence and Defendant grabbed her and refused to allow her to leave. Eventually Defendant released the Plaintiff and she left the home. The Court considered this factor and gave it significant weight.

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court: Neither party has been subject to a shared parenting decree. The Court considered this factor, but gave it no weight.

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state: Plaintiff continues to reside in what was formerly the marital residence. She has no plans to relocate from the same. Defendant testified that he was uncertain about whether he would be moving outside the state of Ohio. The Court considered this factor and gave it weight.

When the parties were living together, the Plaintiff was the primary caregiver for the child. She is currently well bonded and breastfeeding the child. This breastfeeding occurs approximately four (4) times a day. Defendant was frequently absent from the martial residence for extended periods of time. Plaintiff testified that the Defendant regularly consumes an excess amount of alcohol. She advised when under the effects of alcohol the Defendant is abusive. Attempts were made to get the Defendant to curb or stop his drinking, but such attempts were

5

unsuccessful; this included such things as family intervention, AA meetings and intensive outpatient treatment for alcohol abuse.

Plaintiff also had concerns that Defendant was abusing prescription medication. This is based on his past use of Oxycodone pills based on a valid prescription, coupled with the Defendant's request for additional pills of the same type from the Plaintiff's sister. The Court notes that each of the parties consented to a voluntary urine test to determine the presence of various controlled and illegal substances. Each of the parties tested negative for such substances.

The parties separated from one another in May of 2015. This occurred, after an incident involving the Defendant watching their child. The child was in the care of the Defendant when Plaintiff was taking a shower. Plaintiff finished her shower and found the Defendant passed out due to alcohol consumption. The child was screaming and upset. Since their separation, Plaintiff has continued to be the primary caregiver for this child.

Defendant presented little evidence about his own involvement in his son's life.

The Court considered all of the evidence presented in this case, and finds based on the evidence presented finds that the Plaintiff is the best person to be the residential parent. While the child is fortunate to have two loving and caring parents, the Court finds that it is in the child's best interest that the Plaintiff be named the residential parent. The Court believes this arrangement will enable the child to have a stable, healthy and safe environment, and further foster a positive relationship with both of the parents.

### B. Parenting Time

Based upon the testimony presented and/or stipulations entered into by the parties, the non-residential parent shall be awarded parenting times with the minor children as found below. The residential parent shall have all parenting time not awarded to the non-residential parent:

6

(1) <u>Parenting Time</u>: Defendant shall have supervised parenting time every other Saturday, beginning at 9:00 a.m. and ending at 7:00 p.m. Defendant's first alternating Saturday visitation will begin on March, 4, 2017. Parties are free to modify the parenting schedule, such that it may occur on either the Friday before or the Sunday after the scheduled parenting time. Such modification can only occur if the parties agree upon the same. Otherwise, the scheduled parenting time will occur on Saturday.

(2) <u>Visitation Supervisor</u>: Defendant's parenting time shall be supervised by his mother (Kim Wilcox, 641 State Route 303, Streetsboro, Ohio 44241), or some other person approved by the Plaintiff. If the Defendant's mother is not available, and the parties cannot agree upon an alternate supervisor, parenting time for the Defendant may take place at the Close to Home Supervised Visitation Center, located at 144 South 30th Street, Newark, Licking County, Ohio. Defendant shall be responsible for the cost of any supervised visitation.

(3) <u>Holidays</u>: Holiday parenting time shall be determined pursuant to Local Rule 19, which includes Days of Special Meaning; unless agreed otherwise by the parties. Any holiday parenting time shall be supervised.

(4) <u>Summer Vacation Time</u>: The Court finds based on the strong bonds between the Plaintiff and the child, the circumstances surrounding this case, that any extended summer parenting time is not in the child's best interest at this time. Once the child gets older, the parties are free to petition the Court to modify this parenting time order to include summer vacation time.

(5) <u>Summer School</u>: If summer school is necessary for any child to pass into the next grade, each parent is responsible for getting that child to school during their summer parenting time. Summer school shall have priority over any scheduled vacation plans.

7

(6) <u>Extracurricular Activities</u>: It is anticipated that in the future that the child will become involved in extracurricular activities, both through school and the community. Each party shall be responsible for one half of the cost of any extracurricular activity. Both parties shall ensure that any child continues to attend such activities, meetings, practices, events and games, while the child is under their custody or control. The cost associated with any extracurricular activities shall be paid by the parent who signed the child up for said activity.

(7) <u>Homework</u>: Both parties must ensure any child is able to complete their homework when in their care and custody. If a child needs assistance, the party will provide it. If the party is unable to provide such assistance, that party shall take those steps necessary to ensure another person is able to assist that child. At the time of the exchange of any child, the parties shall ensure their homework will go with them.

(8) <u>Child Safety</u>: In all instances in which any child is required by Ohio law to be transported in a child safety seat, the party responsible for transportation of this child shall ensure the child is in a properly installed child safety seat. In all other instances, the party responsible for transportation shall transport any child using a properly functioning seat belt. Only a driver with a current, valid license may transport any child.

(9) <u>Exchange Location</u>: The parties will meet to exchange the child at the McDonalds restaurant located at 211 Adena Drive, Newcomerstown, Ohio 43832.

(10) <u>Transportation</u>: Each party shall be responsible for transporting the child to and from the exchange location. Further, each party shall be responsible for any transportation needs of any child when in their care and custody.

(11) <u>Telephone Access</u>: Telephone, text messaging and computer communication by any child with the parent with whom they are not with shall occur at

8

reasonable times and shall not be interfered with by the other parent. This provision of the parenting order will not take effect until the child has reached the age of at least five (5) years, unless otherwise agreed by the parties.

(12) Medical Issues: Parties will keep each other informed of any medical problems or emergencies that arise while any child is in their custody or care. Further, the parties shall keep the other informed of any known medical issues or problems of any child. Each shall be able to attend medical appointments and procedures for any child. Finally, the residential parent shall provide nonresidential parent notice of any medical appointments and known issues with any child.

(13) School Issues: Parties will keep each other informed of any school events or activities known to them that involve any child. Each shall be able to attend any school events or activities. The residential parent shall provide the non-residential parent notice of any known school activities (i.e. school dances, parent teacher conferences, plays, etc.) or sporting events that involve any child.

(14) Altering Appearance: The nonresidential parent shall not alter the physical appearance of any child without the prior written consent of the residential parent. This includes the cutting or coloring of any child's hair, the piercing of ears or other parts of the body, permanent tattooing, or any other act that appreciably alters the physical appearance of any child.

(15) Consumption of Alcohol: Evidence was presented that one or both of the parties may be consuming alcohol in excess. Neither parent shall consume any alcoholic beverage during their parenting time or at least eight (8) hours before beginning the same.

(16) Consent Protection Order: Evidence was presented that the parties have entered into an agreed consent agreement which resolved a petition for a

9

Domestic Violence Protection Order (Licking County Domestic Court Case Number 2016 DR 00027). The Court notes that this decree may contain various provisions for contact between the parties. The Court wishes to make it clear that any such provision is not intended to alter the restrictions imposed on the parties pursuant to the aforementioned consent agreement. Therefore, any provision of this decree which appears to permit contact shall be through a third party (Kim Wilcox), and will not permit direct contact between the Defendant and Plaintiff. *State v. Price*, 2008-Ohio-1974.

Both parents shall keep the other informed of his or her current mailing and email address and telephone number at all times. Both parents shall also provide the other parent with a telephone number for contact in the event of an emergency.

The parties shall not discuss any aspect of this case with any child. The parties shall not degrade or speak badly about the other parent to any child.

The Court enters this order based upon its consideration of the overall evidence admitted into the record and upon the consideration of this evidence in light of the best interest factors set forth in Ohio Revised Code Section 3109.051(C) and (D).

## C. Child Support, Cash Medical Support, and Health Care Orders

All payments shall be made to the Ohio CSPC, P.O. Box 182394, Columbus, Ohio 43218-2394. Cash or credit card payments may be made at the Licking County Child Support Enforcement Agency, 65 E. Main Street, Newark, Ohio 43055.

**NOTWITHSTANDING SECTION 3109.01 OF THE REVISED CODE, THE PARENTAL DUTY OF SUPPORT TO CHILDREN, INCLUDING THE DUTY OF A PARENT TO PAY SUPPORT PURSUANT TO A CHILD SUPPORT ORDER, SHALL CONTINUE BEYOND THE AGE OF MAJORITY AS LONG AS THE CHILD CONTINUOUSLY ATTENDS ON A FULL-TIME BASIS ANY RECOGNIZED AND ACCREDITED HIGH SCHOOL OR A COURT-ISSUED CHILD SUPPORT ORDER PROVIDES THAT THE DUTY OF SUPPORT CONTINUES BEYOND THE AGE OF MAJORITY. EXCEPT IN CASES IN WHICH A CHILD SUPPORT ORDER**

10

REQUIRES THE DUTY OF SUPPORT TO CONTINUE FOR ANY PERIOD AFTER THE CHILD REACHES AGE NINETEEN, THE ORDER SHALL NOT REMAIN IN EFFECT AFTER THE CHILD REACHES AGE NINETEEN. THAT DUTY OF SUPPORT SHALL CONTINUE DURING SEASONAL VACATION PERIODS.

All child support under this order shall be withheld or deducted from the income or assets of the obligor pursuant to a withholding or deduction notice or appropriate Court order issued in accordance with Chapters 3119, 3121, 3123, and 3125 of the Revised Code or a withdrawal directive issued pursuant to Sections 3123.24 to 3123.38 of the Revised Code and shall be forwarded to the obligee in accordance with Chapters 3119, 3121, 3123, and 3125 of the Revised Code.

EACH PARTY TO THE SUPPORT ORDER MUST NOTIFY THE CHILD SUPPORT ENFORCEMENT AGENCY IN WRITING OF HIS OR HER CURRENT MAILING ADDRESS, CURRENT RESIDENCE ADDRESS, CURRENT RESIDENCE TELEPHONE NUMBER, CURRENT DRIVER'S LICENSE NUMBER, AND OF ANY CHANGES IN THAT INFORMATION. EACH PARTY MUST NOTIFY THE AGENCY OF ALL CHANGES UNTIL FURTHER NOTICE FROM THE COURT. IF YOU ARE THE OBLIGOR UNDER A CHILD SUPPORT ORDER AND YOU FAIL TO MAKE THE REQUIRED NOTIFICATIONS YOU MAY BE FINED UP TO $50.00 FOR A FIRST OFFENSE, $100.00 FOR A SECOND OFFENSE, AND $500.00 FOR EACH SUBSEQUENT OFFENSE. IF YOU ARE AN OBLIGOR OR OBLIGEE UNDER ANY SUPPORT ORDER AND YOU WILFULLY FAIL TO MAKE THE REQUIRED NOTIFICATIONS YOU MAY BE FOUND IN CONTEMPT OF COURT AND BE SUBJECTED TO FINES UP TO $1000.00 AND IMPRISONMENT FOR NOT MORE THAN 90 DAYS.

IF YOU ARE AN OBLIGOR AND YOU FAIL TO MAKE THE REQUIRED NOTIFICATIONS YOU MAY NOT RECEIVE NOTICE OF THE FOLLOWING ENFORCEMENT ACTIONS AGAINST YOU: INSTITUTION OF LIENS AGAINST YOUR PROPERTY; LOSS OF YOUR PROFESSIONAL OR OCCUPATIONAL LICENSE, DRIVER'S LICENSE, OR RECREATIONAL LICENSE; WITHHOLDING FROM YOUR INCOME; ACCESS RESTRICTION AND DEDUCTION FROM YOUR ACCOUNTS IN FINANCIAL INSTITUTIONS; AND ANY OTHER ACTION PERMITTED BY LAW TO OBTAIN MONEY FROM YOU TO SATISFY YOUR SUPPORT OBLIGATION.

The residential parent or the person who otherwise has custody of the child for whom a support order is issued is also ordered to immediately notify, and the obligor under a support

11

order may notify, the Licking County Child Support Enforcement Agency of any reason for which the support order should terminate, including but not limited to, the child's attainment of the age of majority if the child no longer attends an accredited high school on a full-time basis and the support order does not provide for a duty of support to continue past the age of majority; the child ceasing to attend such a high school on a full-time basis after attaining the age of majority if the support order does not provide for the duty of support to continue past the age of majority; or the death, marriage, emancipation, enlistment in the armed services, deportation, or change of legal or physical custody of the child. Any payments in child support not made through the Ohio CSPC or the Licking County Child Support Enforcement Agency shall be considered a gift.

The parent ordered to pay child support shall notify the CSEA immediately, in writing, of any change in employment (including self-employment), and of the availability of any other sources of income, including but not limited to, workers compensation payments, retirement or pension benefits, disability or sick pay, insurance proceeds, lottery prize awards, federal, state or local government benefits, trust fund or endowment fund income, vacation pay, commissions and draws against commissions paid on a regular basis, bonus or profit sharing payments or distributions, or any other lump sum payments that may be subject to a withholding or deduction order. Said notification shall include a description of the nature of the new employment, and the name and business address of the new employer, or the type, source, and amount of income received, or a description of the nature of any new account opened at any financial institution, along with the name and business address of the financial institution.

21-05001-amk    Doc 11    FILED 02/05/21    ENTERED 02/05/21 09:01:19    Page 31 of 73

Failure to comply with the foregoing orders of notification and reporting may result in a finding of contempt. Attorney fees and court costs may then be assessed against you if you are found in contempt of court.

Any notice required by this entry is hereby ordered to be sent to the following address:

> Licking County Child Support Enforcement Agency
> 65 East Main Street
> Newark, Ohio 43055

The Court finds that health insurance is not available to either party through a group policy, contract or plan. In the event health insurance is considered available at a reasonable cost through the employer of either parent, that person shall be designated the Healthcare-Obligor.

The Court enters the following orders regarding health care expenses and health insurance for the following child(ren):

████████████ born ████████████

(1) The Healthcare-Obligor shall maintain health insurance coverage for any minor child as long as it is available at a reasonable cost through their employer. The Healthcare-Obligor shall maintain medical, dental and optical for any minor child as long as it is available at a reasonable cost through their employer. Private health insurance for any child is deemed available if it is offered by an employer or other group plan, accessible (meaning health care services are located within 30 miles of any child's residence), and reasonable in cost (meaning the cost to insure any child is no more than 5% of the insurance Obligor's gross annual income).

Both parents are responsible for healthcare of any child, such that each will be deemed to be the Healthcare-Obligor if the private insurance coverage becomes available to them and not the other party. In the event both parents have private insurance coverage available, the residential parent shall be deemed the Healthcare-Obligor.

13

Further, if you are required by this order to provide health insurance coverage for any child, you MUST submit a copy of this ORDER to the insurer AND provide WRITTEN proof to the Child Support Enforcement Agency that you have obtained health insurance and have provided a copy of this order to your insurer.

If you are required to obtain health care insurance and fail to obtain coverage within 30 days, the Child Support Enforcement Agency shall request the Court to issue an order to your employer to take whatever action is necessary to enroll any child in the health care insurance plan made available by your employer and deduct the necessary costs from your income.

(2) Reimbursement of out-of-pocket medical, optical, hospital, dental, or prescription expenses paid for any child is to the party paying the cost.

If the order requires you to provide health insurance for any child, you are to provide the insurer a statement setting forth the name, address, and telephone number of the individual(s) who is/are to be reimbursed for out-of-pocket medical, optical, hospital, dental, or prescription expenses paid for each child under a statement that the health plan administrator that provides the health insurance coverage for the child may continue making payment for medical, optical, hospital, dental, or prescriptions services directly to any health care provider in accordance with the applicable health insurance.

(3) The Healthcare-Obligor shall designate any child who is the subject of this order as a covered dependent under any health insurance or health care policy, contract, or plan for which the Health-Obligor contracts.

(4) The Healthcare-Obligor MUST inform their employer that this order REQUIRES the employer to release all necessary information about the health care insurance to the other parent, any person subject to an order under Ohio Revised Code 3109.19 or the Child Support Enforcement Agency upon written request.

14

(5) The Healthcare-Obligor MUST provide the other party with information regarding the benefits, limitations, and exclusions of the health insurance plan, copies of any insurance forms necessary to receive reimbursement, payment, or other benefits under the health insurance plan and a copy of any necessary insurance cards within thirty days after the issuance of this order.

(6) The child(ren) to be covered by health care insurance under this order are:
████████ (DOB: ██████████)

(7) EACH PARTY MUST COMPLY WITH ALL PROVISIONS UNDER PARAGRAPHS (3) AND (5) WITHIN 30 DAYS OF THE FILING DATE OF THIS ORDER.

(8) If the party required to obtain health care insurance coverage for any child subject to this order obtains new employment the Agency shall comply with the requirements of Section 3119.34 of the Ohio Revised Code which may result in the issuance of a notice to the new employer to take whatever action is necessary to enroll the child in health care insurance coverage provided by the new employer.

(9) A list of group health insurance plans available to either party is as follows:
None

Pursuant to R.C. 3119.30(A), both parents are liable for the health care of the children who are not covered by private health insurance or cash medical support as calculated in accordance with section. 3119.022 or 3119.023 of the Revised Code, as applicable.

The effective date of this support order shall be the date of the second temporary order, which was November 7, 2016.

A child support worksheet is completed and attached to this divorce decree and shall be considered as findings by this Court and incorporated as if fully written herein.

15

"Income" means either the gross income of an employed parent or the potential income of an underemployed parent. 3119.01(C)(5).

When computing child support payments, the trial court must first determine the parties' annual gross income. "Gross income" can include bonuses and overtime. R.C. 3119.05(D).

When computing overtime and bonus amounts, the Court can either use the yearly average of all overtime, commissions, and bonuses received during the three years immediately prior to the time when the person's child support obligation is being computed or the total overtime, commissions, and bonuses received during the year immediately prior to the time when the person's child support obligation is being computed. The Court should use the lesser of these two amounts. R.C. 3119.05(D)(1)/(2).

"Gross income" can also include employee benefits such as use of company vehicle, cell phone, car insurance or other such amenities. *Morrow v. Becker*, 2013-Ohio-4542 at ¶15-16.

Plaintiff is self-employed as a breeder for golden retrievers. Plaintiff testified that she earns $12,500.00 from this business. Plaintiff also receives a rent check of $400.00 each month from her sister. While Plaintiff claims this will soon end, currently she is receiving the same. Based on her testimony, the Plaintiff's income is determined to be $17,300.00.

Plaintiff has no physical or mental disability which would prevent her from being employed. Plaintiff testified that she is currently going to school full time as a student.

Unless there is some emotional or physical condition which would impair the ability of a party to work, it is not error to impute minimum wage for the purpose of computing child support. *Combs v. Combs*, 2009-Ohio-1683, ¶45; see also *Pamela K. Boyer v. Timothy A. Boyer*, 94-LW-1299, 94 CA 53; *Borer v. Borer*, 2007-Ohio-3341, ¶23.

16

Plaintiff is imputed to be full time minimum wage. Her income for child support purposed is determined to be $16,848.

Defendant is currently unemployed. He was previously receiving unemployment but that recently stopped. Defendant has no physical or mental disability which would prevent him from being employed.

Defendant is imputed to be full time minimum wage. His income for child support purposed is determined to be $16,848.

No evidence of any adjustments or deduction was admitted in this case. The Court finds that none exist, or in the alternative, that the parties failed to put forth sufficient evidence to justify awarding a deduction or adjustment. The burden of establishing any adjustments or deductions is placed on the shoulders of the party asking for the adjustment. *Butler v. Butler*, 2002-Ohio-5877, ¶20; see also *Cronin v. Cronin*, 2012-Ohio-5592, ¶27; *Brown v. Brown*, 2009-Ohio-4913, ¶61.

Having determined the incomes of the parties, the Court must now decide which of them shall be the obligor for child support purposes. The person required to pay support (obligor) is generally the non-residential parent, due to the fact that the funds are presumably to be used to care for and support the child. R.C. 3119.07(A); see also *In re Marriage of Stearns (1993)*, 88 Ohio App.3d 264 at 275.

The Defendant is designated the obligor for child support purposes. This designation is made based on his designation as the non-residential parent.

During any time on or after the effective date of this order that private health **insurance IS in effect**, the following orders shall apply:

17

1. Defendant shall pay child support of $239.92 per month, plus processing fee, and $0.00 per month, plus processing fee, in cash medical support.

2. All ordinary uninsured health care expenses (defined as the first $100.00 per year, per child in uncovered expenses) shall be paid by Plaintiff. Plaintiff shall pay 51% and Defendant shall pay 49% of all extraordinary uninsured health care expenses for the child.

During any time on or after the effective date of this order that private health insurance **IS NOT in effect**, the following orders shall apply:

1. Defendant shall pay child support of $239.92 per month, plus processing fee, and $0.00 per month, plus processing fee, for cash medical support.

2. All ordinary uninsured health care expenses (defined as the first $100.00 per year, per child in uncovered expenses) shall be paid by Plaintiff. Plaintiff shall pay 51% and Defendant shall pay 49% of all extraordinary uninsured health care expenses for the child.

Any arrearage which is owed pursuant to any temporary orders shall remain in full force and effect. Further, any arrearage, which shall become due, shall be paid off at a rate of 20% of the current order. The Court finds the statutory presumptive amount of 20% to pay off arrearages is appropriate in this case. Any arrearages shall be paid off at this rate until satisfied. R.C. 3123.21; see also *Lepowsky v. Lepowsky*, 2010-Ohio-1544 at ¶52; *Hayman v. Hayman*, 2009-Ohio-4855 at ¶42; *Lyons v. Bachelder*, 2005-Ohio-4887, ¶34.

If the obligor is ordered to pay cash medical support under this support order, the obligor shall begin payment of any cash medical support on the first day of the month immediately following the month in which private health insurance coverage is unavailable or terminates and shall cease payment on the last day of the month immediately preceding the month in which

18

private health insurance coverage begins or resumes. During the period when cash medical support is required to be paid, the obligor or obligee must immediately inform the Child Support Enforcement Agency that health insurance coverage for the children has become available.

The amount of cash medical support paid by the obligor shall be paid during any period after the court or child support enforcement agency issues or modifies the order in which the children are not covered by private health insurance.

Any cash medical support paid pursuant to R.C. 3119.30 (C) shall be paid by the obligor to either the obligee if the child is not a Medicaid recipient, or to the office of child support to defray the cost of Medicaid expenditures if the child is a Medicaid recipient. The child support enforcement agency administering the court order shall amend the amount of monthly child support obligation to reflect the amount paid when private health insurance is not provided, as calculated in the current order pursuant to section 3119.022 or 3119.023 of the Revised Code, as applicable.

The Child Support Enforcement Agency shall give the obligor notice in accordance with Chapter 3121 of the Ohio Revised Code and provide the obligor an opportunity to be heard if the obligor believes there is a mistake of fact regarding the availability of private health insurance at a reasonable cost as determined under Ohio Revised Code Section 3119.30(B).

### D. Income Tax Dependency Exemption

"Whenever a court issues, or whenever it modifies, reviews, or otherwise reconsiders a court child support order, it shall designate which parent may claim the children who are the subject of the court child support order as dependents for federal income tax purpose." R.C. 3119.82.

"In cases in which the parties do not agree which parent may claim the children as dependents, the court shall consider, in making its determination, any net tax savings, the relative financial circumstances and needs of the parents and children, the amount of time the children spend with each parent, the eligibility of either or both parents for the federal earned income tax credit or other state or federal tax credit, and any other relevant factor concerning the best interest of the children." R.C. 3119.82.

When the tax allocation is given to the non-residential parent, the Court must make a finding that awarding the allocation to the non-residential parent is in the best interest of the child. *Maynard v. Landon*, 2007-Ohio-2813 at ¶17.

The presumption that the residential parent will receive the tax exemption will remain, unless the non-residential parent can put forth evidence to show that it is in the best interest of the child to do otherwise. This can be accomplished by showing a greater benefit to the non-residential parent with evidence of the "net tax savings, the relative financial circumstances and needs of the parents and children, the amount of time the children spend with each parent, the eligibility of either or both parents for the federal earned income tax credit or other state or federal tax credit, and any other relevant factor concerning the best interest of the children." R.C. 3119.82.

The Court finds it is in the best interest of the child for the Plaintiff to receive the tax allocations in this case. Insufficient evidence was presented to overcome the presumption that the residential parent shall receive the tax allocation. Further, the Court has considered the evidence and circumstances of this case and finds it in the best interest of the children that the Plaintiff receives the allocation.

20

## E. **Statutory Notices**

(1) **RELOCATION NOTICE:** Pursuant to Ohio Revised Code Section 3109.051(G), the parties hereto are hereby notified as follows:

IF THE RESIDENTIAL PARENT INTENDS TO MOVE TO A RESIDENCE OTHER THAN THE RESIDENCE SPECIFIED IN THE COURT ORDER, THE RESIDENTIAL PARENT SHALL FILE A NOTICE OF INTENT TO RELOCATE WITH THIS COURT, ADDRESSED TO THE ATTENTION OF THE RELOCATION OFFICER. UNLESS OTHERWISE ORDERED PURSUANT TO O.R.C. SECTIONS 3109.051(G)(2), (3) AND (4), A COPY OF SUCH NOTICE SHALL BE MAILED BY THE COURT TO THE PARENT WHO IS NOT THE RESIDENTIAL PARENT. UPON RECEIPT OF THE NOTICE, THE COURT, ON ITS OWN MOTION OR THE MOTION OF EITHER PARTY, MAY SCHEDULE A HEARING WITH NOTICE TO BOTH PARTIES TO DETERMINE WHETHER IT IS IN THE BEST INTEREST OF THE CHILD TO REVISE THE VISITATION SCHEDULE.

(2) **RECORDS ACCESS NOTICE:** Pursuant to Ohio Revised Code Sections 3109.051(H) and 3319.321(B)(5)(a) the parties hereto are hereby notified as follows:

EXCEPTING AS SPECIFICALLY MODIFIED OR OTHERWISE LIMITED BY COURT ORDER, AND SUBJECT TO O.R.C. SECTIONS 3125.16 AND 3319.321(F), THE PARENT WHO IS NOT THE RESIDENTIAL PARENT IS ENTITLED TO ACCESS TO ANY RECORD THAT IS RELATED TO THE CHILD, UNDER THE SAME TERMS AND CONDITIONS AS THE RESIDENTIAL PARENT, AND TO WHICH SAID RESIDENTIAL PARENT IS LEGALLY PROVIDED ACCESS. ANY KEEPER OF A RECORD WHO KNOWINGLY FAILS TO COMPLY WITH THIS ORDER IS IN CONTEMPT OF COURT.

(3) **DAY CARE CENTER ACCESS NOTICE:** Pursuant to Ohio Revised Code Section 3109.051(I), the parties hereto are hereby notified as follows:

EXCEPTING AS SPECIFICALLY MODIFIED OR OTHERWISE LIMITED BY COURT ORDER, AND IN ACCORDANCE WITH O.R.C. SECTION 5104.011, THE PARENT WHO IS NOT THE RESIDENTIAL PARENT IS

21

ENTITLED TO ACCESS TO ANY DAY CARE CENTER THAT IS OR
WILL BE ATTENDED BY THE CHILD WITH WHOM PARENTING
TIME IS GRANTED, TO THE SAME EXTENT THAT THE
RESIDENTIAL PARENT IS GRANTED ACCESS TO THE CENTER.

(4) **SCHOOL ACTIVITIES NOTICES:** Pursuant to Ohio Revised Code
Section 3109.051(J), the parties hereto are hereby notified as follows:

EXCEPTING AS SPECIFICALLY MODIFIED OR OTHERWISE LIMITED
BY COURT ORDER, AND SUBJECT TO O.R.C. SECTION 3319.321(F),
THE PARENT WHO IS NOT THE RESIDENTIAL PARENT IS ENTITLED
TO ACCESS, UNDER THE SAME TERMS AND CONDITIONS AS THE
RESIDENTIAL PARENT, TO ANY STUDENT ACTIVITY THAT IS
RELATED TO THE CHILD AND TO WHICH THE RESIDENTIAL
PARENT OF THE CHILD LEGALLY IS PROVIDED ACCESS. ANY
SCHOOL EMPLOYEE OR OFFICIAL WHO KNOWINGLY FAILS TO
COMPLY WITH THIS ORDER IS IN CONTEMPT OF COURT.

## IV.   PROPERTY DIVISION

### A. Real Estate

Based upon the testimony presented and/or a stipulation entered into by the parties, the
Court finds the parties are owners of real estate commonly known as 9268 Mulberry Road,
Mount Perry, Licking County, Ohio. The Court finds and the parties stipulate that this property is
the separate property of the Plaintiff pursuant to the antenuptial agreement.   In the alternative, if
said antenuptial agreement is found to be invalid, this Court finds this real estate is nonetheless
the separate property of the Plaintiff.

Plaintiff will receive this property free and clear of any claim of the Defendant.   The
Court finds and the parties stipulate that there is a debt associated with this property incurred
during the marriage in the amount of $119,343.07.

22

At the time of the marriage there was no debt associated with this real estate. A mortgage was obtained on the home to help pay off marital debt and to make improvements. The monies from this mortgage were used for purposes such as paying off credit cards under the names of the parties, real estate tax associated with the real estate, carpeting for the home and other general living expenses. The first mortgage was in the summertime of 2011 and was for approximately $55,000.00. The total amount of the monies used to improve the real estate is found to be $2,200.00.

A second mortgage was obtained though Huntington Bank in the approximate amount of $128,000.00. This was an increase of about $75,000.00 from the prior mortgage. The second mortgage was used to pay off the first mortgage as well as consolidating additional marital debts. This included paying off the debt associated with the 2010 Chevrolet Silverado as well as the Defendant's student loans. The student loans being paid off were incurred by the Defendant prior to the marriage.

"Debts incurred during the marriage are presumed to be marital unless it can be proved that they are not." *Calvert v. Calvert*, 2013-Ohio-4421 at ¶33. The party wishing to overcome this presumption bears the burden of producing the evidence necessary to establish the debt was separate.

Defendant argued that the debt associated with the aforementioned property should be found to be the sole debt of the Plaintiff. This is based on either a claim that it is connected to the real estate (Plaintiff's separate property) and/or that the Defendant's obligation to pay said debt has been discharged from the bankruptcy. The Court is not persuaded by the Defendant's

23

arguments and finds this debt to be marital; an exception being $2,000 which was used solely for improvements to the real estate and is found to be a separate debt of the Plaintiff.

Defendant also testified about various improvements made to the marital residence and argued that compensation should be given for the same (Exhibit K). Defendant estimated that the total amount of the contribution was $14,000.00. During cross examination, the Defendant conceded that some of the purported improvements were really items purchased for the business and not the residence. Plaintiff testified that the monies used to the pay the separate debt of the Defendant (premarital student loans) from the mortgage was greater than the purported $14,000.00 claimed by the Defendant.

"When either spouse makes a contribution, whether it is monetary, due to labor, or in-kind, that causes an increase in the value of separate property, the increase in the value is active appreciation and deemed marital property." *Brown v. Brown*, 2009-Ohio-4913 at ¶20, citing *Middendorf v. Middendorf*, 1998-Ohio-403.

The Court finds that the aforementioned improvements would fall under the antenuptial agreement, such that any improvements would be Plaintiff's separate property; see Paragraph (IV)(O) of this Decree. In the alternative, the Court finds that the Defendant has failed to establish the value of any purported improvements sufficiently for the Court to determine the value of the purported improvements. Much of the evidence showed the purported improvements were for items or improvements not related to the real estate, but instead other martial property which is being equitably divided between the parties; therefore Defendant will receive his fair share for these contributions.

24

Additionally, even if that were not the case, and the Defendant had successfully showed some increase in value to the real estate based on these purported improvements, then this would mean the real estate is now a combination of separate and marital property. When dealing with such comingled property the Court has the ability to award property in an equitable manner. *Howcroft v. Howcroft*, 2010-Ohio-6410 at ¶58, citing *Lee v. Lee*, 2009-Ohio-5250; see *Cherry v. Cherry* (1981), 66 Ohio St.2d 348.

Based on the evidence presented the Court finds that the Defendant benefited from the loans associated with the property; this includes but is not limited to the payment of his student loans which are found to be a separate debt. This bulk of this debt is being divided between the parties, such that the Court finds it would be equitable to divide the commingled property in the fashion stated in this Decree.

The Court finds that $117,343.07 of the aforementioned mortgage debt is marital in nature. The remaining portion is found to be a separate debt of the Plaintiff ($2,000); these monies have been used to improve the real estate awarded to the Plaintiff. The Court finds dividing the debt in such a fashion is equitable based on the facts and circumstances of this case.

Plaintiff will be solely responsible for any debt associated with the real estate and will hold the Defendant harmless thereon. She will be credited with having received a marital debt of such value.

Each party shall assume and pay any mortgage(s) owing on any real estate awarded to him or her as set forth above, and shall hold the other party harmless thereon. Further, within three (3) months of the filing of this Decree, each party shall take those steps necessary to refinance any existing mortgage indebtedness, which involves the other party, and otherwise

25

remove the other party from any underlying debt associated with the real estate. Further, Defendant shall cooperate with Plaintiff and sign a power of attorney within fourteen (14) days of this Decree so that she will be able to deal with the bank currently holding the mortgage on this case. Defendant shall not impede the ability of the Plaintiff to deal with or pay on this mortgage and shall limit his contact with the mortgage company until further order to simply determine whether payments are being made as required.

Each party shall take those steps necessary to execute a quit-claim deed in accordance with the awards set forth in the Decree, and if either party should fail to execute a quit-claim deed within fourteen (14) days of the filing of this Decree, then this Decree shall operate as authority to all public and private officials, including but not limited to the Licking County Engineer, Auditor and Recorder, to transfer all rights, title and interest of said party in said real estate to the party awarded said real estate.

The Court finds the division of any real estate is fair and equitable.

**B. Vehicles**

Based upon the testimony presented and/or a stipulation entered into by the parties, the Court finds parties own the following vehicles, which are found to be marital property.

(1) **2009 Ford Expedition:** Evidence was presented that the parties own a 2009 Ford Expedition, which is found to be marital property. The Court finds, and the parties stipulate, that the value of this vehicle is $10,000.00. There is a lien attached to this vehicle in the amount of $11,691.17. The Court awards this vehicle to the Plaintiff, free and clear of any claim of the Defendant, and she shall be credited with receiving a marital asset and debt of such value.

26

(2) **2014 Chevrolet Cruise:** Evidence was presented that the parties own a 2014 Chevrolet Cruise, which is found to be marital property. The Court finds, and the parties stipulate, that the value of this vehicle is $3,000.00. There is a lien attached to this vehicle but it was discharged in bankruptcy. The Court awards this vehicle to the Defendant, free and clear of any claim of the Plaintiff, and he shall be credited with receiving a marital asset and debt of such value.

(3) **2010 Chevrolet Silverado:** Evidence was presented that the parties own a 2010 Chevrolet Silverado, which is found to be marital property. The Court finds, that the value of this vehicle is $8,500.00. There is no lien attached to this vehicle. The Court finds this vehicle was given to the Defendant's father in satisfaction of monies borrowed from his parents. The vehicle is no longer the property of the parties.

However, simply because the vehicle no longer is in existence doesn't mean the Court cannot consider whether it was marital and was used to satisfy a non-marital debt. "If a trial court was rendered powerless to recognize and determine property rights and assets that do not exist at the time of the final decree, one party, from the time of separation to the time of the final decree, could withdraw all funds and, unilaterally and with impunity, squander the fruits of the marital labor." *Celeschi v. Celeschi*, 2011-Ohio-375 at ¶21, quoting *Berish v. Berish* (1982), 69 Ohio St.2d 318, 320-321.

Parties are in dispute about whether this vehicle was used to satisfy a marital or non-marital debt. Evidence presented showed that the debt was incurred for attorney fees (criminal case involving purported fraud) and satisfaction of monies owed on a civil case. The Fifth District has "held that in some circumstances, debt incurred during the pendency of a divorce is properly classified as the separate debt of the spouse who incurs it." *Dooley v. Dooley*, 2006-Ohio-6938 at ¶33.

21-05001-amk   Doc 11   FILED 02/05/21   ENTERED 02/05/21 09:01:19   Page 46 of 73

Plaintiff testified she was unaware of the transfer but later learned that it was offered as collateral for a loan from Defendant's parents. "Debts incurred during the marriage are presumed to be marital unless it can be proved that they are not." *Calvert v. Calvert*, 2013-Ohio-4421, ¶33. Based on the evidence presented the Court finds that the aforementioned vehicle was disposed of to pay legal fees of a party unrelated to the divorce during the marriage. Neither a party nor a child of the marriage was the victim of the purported conduct that gave rise to the necessity of legal fees. Under such circumstances the Court finds this is a normal marital debt. Since marital property was used to satisfy a normal marital debt there will be no offset to the Plaintiff.

Each party shall assume and pay any loan(s) owing on any vehicle awarded to him or her as set forth above, and shall hold the other party harmless thereon. Further, within thirty (30) days of the filing of this Decree, each party shall take those steps necessary to refinance any existing loan(s) of indebtedness, which involves the other party, and otherwise remove the other party from any underlying debt associated with the vehicle. Finally, the parties shall cooperate with one another to see that the aforementioned vehicles are transferred in a manner consistent with this Decree within thirty (30) days of its issuance.

The Court finds that said division of vehicles is equitable if not equal.

### C. Personal Property, Household Goods, and Furnishings

Based upon the testimony presented and/or stipulations entered into by the parties, the household goods and furnishings have been equally divided and each party shall be awarded the personal property currently in their possession, unless specifically noted in this decree.

(1) **Defendant's Additional Property:** Evidence was presented that the Plaintiff may have possession of items which have been awarded to the Defenadnt as

28

part of the equitable division of household goods. These items are listed on Defendant's B and have been highlighted in blue. Further, the Plaintiff will search for the follwing items contained in Defendant's B, which have not been highlighted: (a) blue safe containing a watch of white gold color, escribed with "Grant T. Wilcox, 2006 from Gandma and Grandpa," (b) a box of crayola markers with handwriting on the box from Defendant's great grandmother, (c) Motoralla fire radio and pager, (d) Yaesu amatuer radio, (e) two Petiner no-bark collars, (f) Generac gas pressure washer, (g) Apple television adapter, (h) Amazon Kindell Fire, and (i) Plantronics 4-10 corded headset phone.

Plaintiff will make a diligent search for all of the aforementioned items and will contact the Defendant's mother (Kim Wilcox) within thirty (30) days of this Decree. Plaintiff believes some of these items have already been returned but will nonetheless make a diligent search to make sure. Once contacted, the Defendant's representative will have thirty (30) days to take those steps necessary to pick up any found items within thirty (30) days of the Decree. Failure to do the same will release any claims the Defendant has to these items.

(2) **Defendant's Denied Property:** Defendant also requested items contained in Defendant's Exhibit B, which are either not highlighted in blue or referenced in the prior section. The Court finds the parties entered into a stipulation prior to the final trial whereby each would receive the household goods in their possession and such was fair and equitable. The Court finds these items are covered by the stipulation. In the alternative, the Court finds these items should be awarded to the Plaintiff as part of the equitable division of debts and assets.

The Court finds and the parties stipulate that said division of personal property and household goods is equitable if not equal.[1]

### D. Financial Accounts

Based upon the testimony presented and/or stipulations entered into by the parties, and unless otherwise noted in this decree, the Court finds each party is awarded and shall retain all bank accounts in his or her respective name, free and clear from any claim of the other party.

Neither party is seeking a portion of any bank accounts of the other. The Court finds, and the parties stipulate, that said division of any bank accounts is equitable if not equal.

### E. Stocks & Bonds

Based upon the testimony presented and/or stipulations entered into by the parties, neither party owns any interest in any stocks, bonds or certificates of deposit. The Court finds, and the parties stipulate, that the marital property does not include any stocks, bonds and certificate of deposits to be divided between the parties.

### F. Business Interest

Based upon the testimony presented and/or a stipulation entered into by the parties, the Court finds the Plaintiff is the sole shareholder of an LLC with the name of Mulberry Retrievers Incorporated. Plaintiff holds all positions associated with the company (President, Secretary and Treasurer). Parties agree that this business is marital property.

The parties could not agree upon a fair market value for the business. Plaintiff offered that the testimony of a person who has been involved in the selling of dogs for approximately fifty (50) years. Defendant objected to the business being determined by an opinion of this

---

[1] Parties stipulated to the division of household goods, but Defendant appeared to later change his mind. Therefore, if the Defendant does not stipulate to the division the Court nonetheless finds the division to be equitable.

30

witness. After discussions with the parties, they reached an agreement to determine the fair market price by offering it for public sale.

The parties will advertise the business for sale for a period of four (4) consecutive weeks in print media. The advertisement will be listed in both the Newark Advocate and the Times Recorder. The print ads must contain a minimum of the following:

(1) That the business will be sold in its entirety and will not be sold piecemeal.

(2) All offers must be in writing.

(3) Seller will consider all legitimate offers, but may elect not to sell the business.

Each party will be responsible for paying one half of the cost of advertising. The ads must be placed with the aforementioned papers within thirty (30) days of the Decree. Any offers must be in writing. Plaintiff will be the point of contact for any offers, but must provide copies of any offers to the Defendant. Parties will cooperate to provide requested information to any potential buyer.

Plaintiff will have the option to keep the business for the highest legitimate offer made to purchase the same. Offers from Defendant or his proxy will not be considered legitimate offers. Offers from Plaintiff or her proxy will not be considered legitimate offers. An offer will be found to be legitimate so long as it is equal to or greater than $1,000.00.

If no legitimate offer is made, or the Defendant fails to provide his one half of the cost of advertising as provided above, the business will be found to have a fair market value of $1,000.00. However, if Plaintiff fails to pay for one half of the advertising cost as provided above, the business will be found to have a fair market value of $10,000.00 and will be awarded to Plaintiff.

Parties must file a notice with the Court indicating the highest legitimate bid received from advertising. Plaintiff must also notify the Court no later than fourteen (14) days of the termination of the print adds whether she has decided to keep the business for highest legitimate bid received or has sold the business to the buyer.

If Plaintiff elects to keep the business for the highest legitimate bid from the advertising, or otherwise receives the business as provided above, she will be awarded the business free and clear of any claim of the Defendant. She will be credited with having received a martial asset for the modified fair market price (see below).

If Plaintiff declines to keep the business for the highest legitimate bid from the advertising, the business will be sold. The sale price will be the fair market value for the business. Plaintiff will receive the proceeds of the sale and distribute them in accordance with the orders contained in this Decree (see below).

Plaintiff will continue to run the business during the pendency of the sale. A log book will be maintained by the Plaintiff which will reflect any expenses for the business as well as any profits made from sale of the dogs; documentation should be kept to support the entries in the logbook.

The fair market value of the business will be modified as follows: (1) Decreased to satisfy the normal cost of sale; Decreased to pay off any debts owed on the business; Increased by any profits made by the business during the pendency of the sale.

Once the fair market value has been so modified, each party will be entitled to one half of the same, but it shall be distributed as follows: The Defendant's share will be used to help satisfy the equalization payment due and owing to the Plaintiff referenced in Paragraph (IV)(K) of this Decree. In the event the Defendant's share is greater than what is due and owing to the Plaintiff,

32

any monies in excess will be given to the Defendant. Plaintiff will receive her one half share of the modified fair market value for the business; either by being awarded the business or by receipt of one half of the modified fair market value if the business is sold.

The Court will retain jurisdiction over the sale of the business. The Court finds that the division of any business interest is equitable if not equal.

**G. Debts**

Based upon the testimony presented and/or stipulations entered into by the parties, and unless otherwise noted in this decree, the Court finds each party shall pay any indebtedness currently in his or her name and shall hold the other party harmless thereon, unless otherwise noted in this Decree.

(1) **Plaintiff's Debts:** Plaintiff shall be responsible for debts in her name.

(2) **Defendant's Debts:** Defendant shall be responsible for debts in his name.

(3) **Real Estate Debts:** Any debts associated with real estate which has been classified as marital debt have already been allocated in Paragraph (IV)(A) of this Decree.

(4) **Vehicle Debts:** Any debts associated with motor vehicles classified as marital property have already been allocated in Paragraph (IV)(B) of this Decree.

(5) **Tax Debts:** Any debts associated with the parties' tax obligations, not specifically addressed herein, have already been allocated in Paragraph (IV)(I) of this Decree.

(6) **Amazon Credit Card:** Evidence was presented that the Plaintiff has a debt from an Amazon Credit Card in the approximate amount of $4,400.00. All debts on this card were incurred during the marriage. The credit card was

33

used to pay normal marital expenses and cost incurred for the marital business. Each party shall be responsible for one half of the same.

(7) **Target Credit Card:** Evidence was presented that the Plaintiff has a debt from a Target Credit Card in the approximate amount of $440.00. All debts on this card were incurred during the marriage. The credit card was used to pay normal marital expenses. Each party shall be responsible for one half of the same.

(8) **Home Depot:** Evidence was presented that the Plaintiff has a debt from a Home Depot Credit Card in the approximate amount of $3,000.00. All debts on this card were incurred during the marriage. The credit card was used to pay for home improvements and repairs (hot water heater and plumbing supplies) of the marital residence ($600). The remaining portions of the debts were incurred for the marital business (remaining debts). The Court finds this to be marital debt. Each party shall be responsible for one half of the same; excluding the $600 found to be separate debt.

(9) **Tractor Supply Credit Card:** Evidence was presented that the Plaintiff has a debt from the Tractor Supply Credit Card in the approximate amount of $3,000.00. All debts on this card were incurred during the marriage. The credit card was used to pay for debts of the marital business. Each party shall be responsible for one half of the same.

(10) **Kohl's Credit Card:** Evidence was presented that the Plaintiff has a debt from the Kohl's Credit Card in the approximate amount of $900.00. All debts on this card were incurred during the marriage. The credit card was used to pay normal marital expenses. Each party shall be responsible for one half of the same.

(11) **First Financial Bank Visa Credit Card:** Evidence was presented that the Plaintiff has a debt from the First Financial Bank Visa Credit Card in the

34

approximate amount of $4,800.00. All debts on this card were incurred during the marriage. The credit card was used to pay normal marital expenses. Each party shall be responsible for one half of the same.

(12) **JC Penny MasterCard Credit Card:** Evidence was presented that the Plaintiff has a debt from the JC Penny Credit Card in the approximate amount of $5,750.00. The credit card was used to pay for normal marital expenses as well as debts for the marital business. Each party shall be responsible for one half of the same.

(13) **Citi Bank Visa Credit Card:** Evidence was presented that the Plaintiff has a debt from the Citi Bank Visa Credit Card in the approximate amount of $3,300.00. All debts on this card were incurred during the marriage. The credit card was used to pay normal marital expenses. Each party shall be responsible for one half of the same.

(14) **Walmart MasterCard:** Evidence was presented that the Plaintiff has a debt from the Walmart MasterCard in the approximate amount of $4,700.00. All debts on this card were incurred during the marriage. The credit card was used to pay normal marital expenses. Each party shall be responsible for one half of the same.

(15) **Plaintiff's Student Loan:** Evidence was presented that the Plaintiff has incurred student loans during the marriage. Plaintiff received $5,300 from the student loans which were used to pay for normal living expenses (e.g. food, utilities, and mortgage). When evidence shows that student loans of one party were used for family expenses, it is reversible error to find the student loans are not martial debt. *Day v. Day*, 2005-Ohio-4343, ¶24. Conversely, where the student loans were incurred during the marriage, but the party has never had the opportunity to see more lucrative job opportunities, and the spouse has not received the benefit of the student loans, it is not an abuse of discretion to

35

allocate the student loans as separate debt. *Vonderhaar-Ketron v. Ketron*, 2010-Ohio-6593 at ¶35; see also *Cooper v. Cooper*, 2015-Ohio-4048. The Court finds that the portion of student loans used to pay normal marital expenses is a marital debt ($5,300). Each party shall be responsible for one half of the same. The remaining portion of the student loan was premarital and/or Plaintiff failed to establish a financial benefit for the marriage.

**(16) Defendant's Student Loans:** Evidence was presented that the Defendant has student loans in the approximate amount of $65,000. Defendant offered no evidence that there was a financial benefit to the marriage from these student loans. Further, it appears the student loans were obtained prior to the marriage. The Court finds the student loan debts is the separate debt of the Defendant.

The Court finds the debts referenced in items six (6) through fifteen (15) are all valid marital debts incurred during the marriage; with the exception of $600 charged to the Home Depot Credit Card which is found to be a separate debt of the Plaintiff. These debts are all in the name of the Plaintiff.



Each party will be responsible for one half of these debts. If either party pays on these debts, they will provide proof of the same to the other party. The non-paying party will then have thirty (30) days to reimburse the paying party for one half of the same. Plaintiff will not submit any request for reimbursement of the first $600 from the Home Depot Credit Card since this is found to be her separate debt.

The Court recognizes that the exact amount of the aforementioned debts is not known. Plaintiff was only able to estimate the value of these debts (Defendant objected to specific proof of said debts on hearsay grounds). However, since the Court finds these

36

debts are marital, and each is being required to pay one half of the same, the division is found to be fair and equitable;

Neither party shall incur any debts or other obligations, which will or might become an obligation or charge against the other party. If such debt or obligation should be incurred on the credit of the other party, the party so incurring the debt or obligation will immediately discharge the same and hold the other harmless.

The Court finds that the division of debts is equitable if not equal.

### H. Life Insurance

Based upon the testimony presented and/or stipulations entered into by the parties, the Court finds the parties own no life insurance policies. The Court finds, and the parties stipulate that the marital property does not include any life insurance policies to be divided between them.

### I. Tax Returns

"A tax refund for income earned during the marriage is marital property." *Hiscox v. Hiscox*, 2008-Ohio-5209 at ¶71, citing *Brewer v. Brewer*, 2004-Ohio-3531, ¶77; see also *Lawson v. Lawson*, 2006-Ohio-6890.

When a tax debt exists, which is found to be marital, the Court should allocate that debt between the parties. *Ohmer v. Renn-Ohmer*, 2013-Ohio-330, ¶39. Financial misconduct may be grounds to allocate tax debt unevenly, but without such a showing it is not reversible error to divide the tax debt between the parties. *Bostick v. Bostick*, 2014-Ohio-736, ¶21-22.

The parties disclosed various known tax debts. This included a debt associated with the marital business in the amount of $1,812.50 (Plaintiff's Exhibit #11) as well as a personal income tax for the Defendant in the amount of $1,754.00 (Defendant's Exhibit J).

Plaintiff will be solely responsible for the business tax debt and will hold the Defendant harmless thereon. Plaintiff will be credited with having received a marital debt of such value. Defendant will be solely responsible for the personal income tax debt and will hold the Plaintiff harmless thereon. Defendant will be credited with having received a marital debt of such value.

With regards to any unknown tax debts, the Court finds the following would be equitable. In the event the parties are required to file an amendment for a tax return period that occurred during their marriage, when they filed a joint return, any subsequent tax debt or refund shall be evenly divided between the parties.

In the event the parties are required to file an amendment for a tax return period that occurred during their marriage, when they filed separately, or later determines that they failed to file a required return for a period during the marriage, any subsequent tax debt or refund shall be the sole responsibility of the party who filed separately or failed to file a return.

A tax refund was used by the Plaintiff to pay on a mortgage referenced in Paragraph (IV)(A) of this Decree. Defendant argues that he should receive an offset based on the Plaintiff using a tax refund (marital property) to satisfy the mortgage. Since the Court has held that the mortgage is a marital debt, no offset will be granted.

The Court finds that said division of any tax return/debt is equitable if not equal.

### J. Retirement Accounts

After listening to all the evidence and judging the credibility of the witnesses and/or based on the stipulations entered into by the parties, the Court finds the parties have the following retirement accounts.

38

Defendant argued that the retirement accounts were covered by the antenuptial agreement. The Court finds that the retirement benefits were not covered by the same and is martial property subject to division; see Paragraph (IV)(O) of this Decree.

(1) **Plaintiff's 401-K:** Evidence was presented that the Plaintiff has a 401-K through Wells Fargo Bank. The Court finds that the value of this account, which was accumulated during the marriage, is marital property. Each party is awarded one half of the marital portion. The Plaintiff shall prepare and submit a Qualified Domestic Relations Order (QDRO), or some other instrument if a QDRO is inappropriate, to divide this retirement account.

(2) **Defendant's 401-K:** Evidence was presented that the Defendant has a 401-K through Arkansas Best Freight System. The Court finds that the portion of this account, which was accumulated during the marriage, is marital property. Each party is awarded one half of the marital portion. The Defendant shall prepare and submit a Qualified Domestic Relations Order (QDRO), or some other instrument if a QDRO is inappropriate, to divide this retirement account. Plaintiff expressed some concern that the Defendant might attempt to deplete this account before division can occur. Since the Plaintiff is receiving one half of the marital portion as of the date of the divorce hearing (February 23, 2017), the monies due to her from this retirement account can be ascertained.

Any Qualified Domestic Relations Orders (QDRO), or other instrument, required by this Decree shall include that the non-pensioner recipient shall be entitled to any Cost of Living Adjustment (COLA) provided for under each respective plan. Further, the non-pensioner recipient shall also be entitled, if he/she so elects, to survivorship benefits provided for under each respective plan. The cost of any survivorship election, if there is any, shall be evenly divided between the parties. In the event that survivorship benefits are not possible under the

39

plan for the non-pensioner recipient, then the non-pensioner recipient may elect to obtain life insurance for the pension plan member in the amount of the marital portion not eligible under survivorship benefits. Any cost of such life insurance shall be born solely by the non-pensioner recipient, but the pension plan member is required to cooperate with the filing of any paperwork necessary to obtain said life insurance. If the pension plan member decides to retire early, the non-pensioner recipient shall still receive one-half of the of the reduced benefit payment or lump sum payment, reflecting the marital portion, which the pension plan member is eligible to receive.

Any non-pensioner recipient shall qualify as surviving spouse under I.R.S. Code Section 410 and 417, and that non-pensioner recipient shall be entitled to the benefits in the event of the other parties' death prior to division and distribution of any retirement account.

The cost of any Qualified Domestic Relations Orders (QDRO), or other instrument, necessary to effectuate the above award shall be evenly divided between the parties. The parties shall use QDRO Consultants to prepare the aforementioned instruments, unless agreed upon otherwise.

The Court finds and the parties stipulate that there are no other retirement accounts. Further, the Court finds that said division of any retirement account is equitable if not equal. The Court will retain jurisdiction over the division of these retirement benefits.

### K. Asset Distribution

The Court finds that the asset/debt distribution in this particular case is equitable if not equal. The Court makes this determination after a review of the Ohio Revised Code Section 3105.171 and specifically those factors set out in Ohio Revised Code Section 3109.04(C)(1) and (F). The following is a summary of the property distribution made in this case.

**Plaintiff**

| | |
|---|---|
| Real Estate | None |
| Real Estate (Debt) | -$117,343.07 |
| Vehicles | -$1,691.17 |
| Household Goods & Furnishings | Equitable Division |
| Financial Accounts | Equitable Division |
| Stock & Bond | None |
| Business Interest | Equitable Division |
| Debts | Equitable Division |
| Life Insurance | None |
| Tax/Debts Returns (General) | Equitable Division |
| Tax/Debts Returns (Specific) | -$1,812.50 |
| Retirement | Equitable Division |

**Defendant**

| | |
|---|---|
| Real Estate | None |
| Real Estate (Debt) | $0.00 |
| Vehicles | $3,000.00 |
| Household Goods & Furnishings | Equitable Division |
| Financial Accounts | Equitable Division |
| Stock & Bond | None |
| Business Interest | Equitable Division |
| Debts | Equitable Division |
| Life Insurance | None |
| Tax/Debts Returns (General) | Equitable Division |
| Tax/Debts Returns (Specific) | -$1,754.00 |
| Retirement | Equitable Division |

Based on the awards in this Decree, the Plaintiff has received an equitable distribution of marital assets and debts. She has also received an additional $0.00 in specific marital assets and $120,846.74 in specific marital debts/offsets. This results in a net negative balance of $120,846.74 of specific marital debts and assets.

Based on the awards in this Decree, the Defendant has received an equitable distribution of marital assets and debts. He has also received an additional $3,000.00 in specific marital assets and $1,754.00 in specific marital debt/offsets. This results in a net positive balance of $1,246.00 of marital debts and assets.

41

The Court finds Defendant has received $122,092.74 more than the Plaintiff based on the allocation of marital debts and assets. An equalization payment is due and owing from Defendant to Plaintiff in the amount of $61,046.37.

This amount shall hereby be reduced to judgment, with interest at the statutory rate. The aforementioned debt shall be paid in installments of five hundred dollars ($500.00) each month, beginning on May 1, 2017, until the debt and interest has been satisfied. If the Defendant so chooses, he may pay off the obligation in a greater amount.

Said equalization payments shall be paid directly to the Plaintiff no later than the 15th day of each month, and shall be made by way of check, money order, or any other similar form that establishes a clear record of payment, unless specifically authorized by this Decree. When the total equalization amount still due is less than five hundred dollars ($500.00), the last payment shall be the amount owed.

Further, the amount owed to the Plaintiff will be reduced by Defendant's share of the fair market value owed to him from the Plaintiff for the business referenced in Paragraph (IV)(F) of this Decree. The Court specifically retains jurisdiction over this issue to enforce the aforementioned equalization payment.

**L. Cost of Sale & Negative Tax Consequences**

The parties presented little or no evidence regarding any purported negative financial circumstances from the division of marital property. Nonetheless, the Court has considered the tax consequences of the property division upon the respective awards made to each of the parties, as well as the cost of any sale if it was necessary for an asset to be sold to effectuate an equitable distribution of property, and finds the division of property provided for in this Decree is equitable. *White v. White*, 2016-Ohio-2997, ¶¶27-32; see also R.C. 3105.171(F)(6)/(7).

42

## M. Necessary Acts

The Court hereby orders unless otherwise outlined above, that the parties perform any act or take any action necessary to effectuate the meaning of the above paragraphs. Further, the Court orders that unless specifically determined above, each party shall execute and deliver, within thirty (30) days upon the filing of this Decree, to the other all deeds, titles, documents or instruments necessary to effectuate this order, and deliver to the other party, or permit the other party to take possession of all items of property to which each is entitled under the terms of this Decree.

## N. Bankruptcy Filing

On December 4, 2016, the Defendant filed a Chapter 7 bankruptcy during the pendency of this case.[2] On December 18, 2016, the Court then stayed the proceedings.[3] On July 20, 2016, the Plaintiff filed a notice that the Defendant's bankruptcy had been discharged.[4] A copy of the discharge was filed with the Court soon thereafter.[5]

"The filing of a petition in bankruptcy operates as a stay of certain legal proceedings against the debtor, including the enforcement of judgments against him as set forth in Section 362, Title 11, U.S.Code." *Sitzman v. Sitzman*, 2006-Ohio-3279 at ¶10.

"[U]ntil the stay has been lifted, the trial court is without jurisdiction to divide marital assets which are also part of...bankruptcy." *Wade v. Wade*, 2002-Ohio-5337 at ¶11.

The Defendant's Chapter 7 bankruptcy has been discharged. Parties stipulate that all of the debts listed in the petition, with the exception of student loans and child support have been

---

[2] Suggestion of Stay and Notice of Filing Chapter Seven Bankruptcy, file stamped December 4, 2015.
[3] Judgment Entry, file stamped December 18, 2015.
[4] Notice of Filing, file stamped July 20, 2016.
[5] Notice of Chapter 7 Bankruptcy Discharge, file stamped July 22, 2016.

43

successfully discharged (Plaintiff's Exhibit #12). None of these debts were affirmed. Neither party was aware of objection having been filed by a creditor for a discharged debt.

The Court finds it has jurisdiction over the property contained in this decree.

### O. Antenuptial Agreement

The parties entered into an antenuptial agreement before the marriage. Neither party objected to the agreement and the Court finds the same would be enforced at trial.[6] Nonetheless, the parties made arguments that the antenuptial agreement did or did not apply to various marital debts or assets.

An antenuptial agreement is a contract between the parties. *Leach v. Leach*, 2016-Ohio-8569, ¶37-38. "The law of contracts applies to the interpretation and application of antenuptial agreements." *Avent v. Avent*, 2006-Ohio-1861 at ¶16. When considering the terms of a contract "[a] reviewing court should give the contract's language its plain and ordinary meaning unless some other meaning is evidenced with the document." *M&G Automotive Service, Inc. v. Bouscher*, 2014-Ohio-5370 at ¶15, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978); see also *Westfield Ins. Co. v. Galatis*, 2003-Ohio-5849 (2003), ¶11; *L & M of Stark County, Ltd. v. Lodano's Footwear, Inc.*, 2006-Ohio-5997, ¶71; *Custom Design Technologies, Inc. v. Galt Alloys, Inc.*, 2002-Ohio-100, ¶8.

*Improvements to Antenuptial Property*

Defendant argued that certain improvements were made to the martial residence during the marriage and that an offset should be granted to him for the value of said improvements. The parties have agreed that the marital residence was included in the antenuptial agreement and is the separate property of the Plaintiff.

---

[6] Judgment Entry, file stamped January 6, 2017.

44

Generally, "[w]hen either spouse makes a contribution, whether it is monetary, due to labor, or in-kind, that causes an increase in the value of separate property, the increase in the value is active appreciation and deemed marital property." *Brown v. Brown*, 2009-Ohio-4913 at ¶20, citing *Middendorf v. Middendorf*, 1998-Ohio-403.

However, marital contributions towards separate property can be excluded depending on the language contained in the antenuptial agreement. *Millstein v. Millstein*, 2002-Ohio-4783, ¶98-101. There is no magic language necessary to exclude marital contributions and the trier of fact must examine the agreement to determine whether an intent to exclude marital effort exists. *Wolf-Sabatino v. Sabatino*, 2011-Ohio-6819 at ¶22-23; see also *Avent v. Avent*, 2006-Ohio-1861, ¶21.

The antenuptial agreement provided that neither party would "have any right, interest or claim in or to the property, now owned by the other party, during their marriage, upon the death of other, or upon divorce, dissolution or a legal separation, except as herein expressly provided for." (Plaintiff's Exhibit #1, Recitals #4). Defendant surrendered all rights to the real estate unless that right was specifically noted in the antenuptial agreement. Nothing in the agreement indicates that either party has any right to seek compensation for martial contributions made towards separate property. Further, the agreement provides that the parties are expected to contribute monies towards the maintenance of property used by them during the marriage.

Based on a review of the entire document, the Court finds that it was the intent of the parties to exclude marital contributions towards property included in the antenuptial agreement. Therefore, Defendant has no claim to the purported contributions made towards the real estate. Assuming arguendo that the agreement provides otherwise, the contributions are found to be normal property maintenance and upkeep which requires no compensation.

45

*Retirement Benefits*

Retirement benefits earned during the marriage are marital property. R.C. 3105.171(3)(a). However, where an antenuptial agreement specifically references retirement benefits as being excluded it is reversible error to divide the same as marital property. *Constance v. Constance*, 2015-Ohio-3244, ¶38-39.

Defendant argues retirement benefits are included in the antenuptial agreement based on Paragraph (V)(A): "[E]ach party is hereby barred from any and all rights, interest or claims by way of dower, inheritance, descent, distribution, allowance, right to reside in the mansion, house, support, alimony, and all rights or claims as spouse, widow, widower, heir, survivor, distribute, or next of kin, and any and all rights and claims, whatsoever in and to the property of the other, whether real, person or mixed, now owned or acquired by gift or inheritance."

"Ohio recognizes dower interest arises when property is purchased during a marriage and continues unless the interest is specifically released, and such a release must be done in writing and recorded." *Cunningham v. Shaffernocker*, 2008-Ohio-7015 at ¶30, citing *Ogan v. Ogan* (1997) Ohio App.3d 580.

"[T]he Ohio Supreme Court explained that a dower right is inchoate because it is dependent upon survivorship. Until that time, an inchoate right of dower is not an interest in land, legal or equitable." *Simmons, M.D. v. Reiner*, 99-LW-5593 (5th District, December 3, 1999) at ¶6, citing *Long v. Long (1919)*, 99 Ohio St. 330, 336.

To put this in simpler terms, dower is a protection offered to a spouse to protect their interest in property that is acquired during the marriage. The right to dower terminates upon the death of spouse with dower interest or the granting of a divorce. *R.C. 2103.02*. Dower does not become vested in the widow or widower unless the other spouse has expired.

46

Dower rights have nothing to do with retirement benefits acquired during the marriage. No evidence was presented that the parties' retirement benefits were included in the antenuptial agreement. Defendant's argument that the retirement benefits should be excluded from division is found to be not well taken and is denied.

## V.    SPOUSAL SUPPORT

After listening to all of the evidence and judging the credibility of the witnesses and/or based on the stipulations entered into by the parties, the Court finds that spousal support is inappropriate and unreasonable. Neither party is requesting spousal support.

In making this determination, the Court considered Section 3105.18 of the Ohio Revised Code, and specifically those factors listed in (C)(A)(a)--(n).

Neither party shall pay the other spousal support. The Court does not retain jurisdiction over this matter, and this order shall not be modifiable by the Court.

## VI.    MISCELLANEOUS

### A. Attorney Fees

Each party shall be responsible for their individual attorney fees, and any pending motion for an award of attorney fees is found to be not well taken and denied, unless otherwise provided for in this Decree.

### B. Court Costs

The costs of this action shall be paid from the parties' deposits and any additional costs not covered by the deposit shall be split evenly between them. Any cost owed shall be paid within thirty (30) days of this Decree. If a refund from the deposit exists it shall be apportioned between the parties based on the percent each contributed towards the overall deposit (i.e. if

plaintiff contributed 75% towards the overall deposit, then plaintiff would receive 75% of any refund from said overall deposit).

### C. Plaintiff's Name

The Court finds the Plaintiff wishes to be restored to her maiden name of Sara N. Butts. The Court orders the same and advises the Plaintiff that she will have to take additional steps to secure a new social security card and driver's license with the restored name.

### D. Defendant's Pending Contempt Motions

On December 28, 2016, the Defendant filed a motion for contempt.[7]  On January 12, 2017, the Defendant filed a second motion for contempt.[8] Defendant claimed the Plaintiff should be held in contempt based on the following conduct: (1) sending a threatening email dated January 3, 2017, in violation of a restraining order, (2) failing to follow parenting time orders, (3) selling or transferring a 2013 Nissan Rogue vehicle, and (4) "misappropriation" of funds used to pay the mortgage on the marital residence.

"There are three elements in a civil contempt: (1) a prior order of the court; (2) proper notice to the alleged contemptnor; and (3) failure to abide by the court order." *Bremer v. Bremer*, 2009-Ohio-176 at ¶11, citing *Rossen v. Rossen* (1964), 2 Ohio App.2d 381.

Defendant failed to admit copies of any court orders which had purportedly been violated.  While Defendant questioned Plaintiff about certain orders issued by the Court, there was little or no evidence of a specific order, nor a request to take judicial notice of the same.

Defendant also failed to establish that the Plaintiff had knowledge of the purported orders at the time she either committed the act or omission which purportedly gave rise to the basis of

---

[7] Motion & Notice of Hearing, file stamped December 28, 2016.
[8] Motion & Notice of Hearing, file stamped January 12, 2017.

48

contempt. A person cannot be held in contempt for violating a court order unless they are aware of the same at the time of the purported contemptuous conduct. *Sylvester v. User Friendly Phone Book*, 2011-Ohio-6610, ¶10-12.

While evidence at trial may have shown at the time of the final hearing that the Plaintiff had knowledge or the purported order, it failed to show this knowledge existed at time of the purported violations. Without proof of the same, the Court cannot find the Plaintiff in contempt.

### Threatening Email

Even assuming arguendo that the Defendant had proven the existence and knowledge of the purported court orders, which did not occur, the Defendant was required to prove the Plaintiff failed to abide by these orders by clear and convincing evidence. *Solove v. Solove*, 2012-Ohio-1335, ¶10. With regards to the threatening email, the Plaintiff was questioned and denied the same. Little or no other evidence was put forth by the Defendant to establish the Plaintiff was the person who sent this email.

### Denial of Parenting Time

With regards to the denied parenting time, the Plaintiff acknowledged that she denied the Defendant parenting time on two separate occasions. Plaintiff explained that she was contacted by Defendant's mother for visitation but would not permit the same since it occurred at a time when the Defendant was incarcerated on felony charges.

"A non-custodial parent's right of visitation with his or her children is a natural right. *Pettry v. Pettry* (1984), 20 Ohio.App.3d 350, 486 N.E.2d 213. The right to visitation should not be denied unless there are extraordinary circumstances. *Foster v. Foster* (1974), 40 Ohio App.2d 257, 272, 319 N.E.2d 395. Extraordinary circumstances include but are not limited to the following: (1) unfitness on the part of the non-custodial parent; and (2) a showing that visitation

49

with the non-custodial parent would cause harm to the children." *Sloat v. James*, 2009-Ohio-2849 at ¶21, citing *Foster*; see also *Smith v. Smith* (1980), 70 Ohio App.2d 87, 434 N.E.2d 749.

Even if the Court were to find the Defendant established the three elements of contempt by clear and convincing evidence, which it does not, the Plaintiff established an affirmative defense of extraordinary circumstances for denying parenting time while Defendant was incarcerated.

### Transfer of Vehicle

Plaintiff admitted to transferring the 2013 Nissan Rogue. Monies used to purchase the Rogue came from disability payments of Emily Hill. Plaintiff was the guardian of the aforementioned person. No marital funds to purchase the same. The Court finds this transfer was not in violation of any temporary order.

### Transfer of Funds from Defendant's Account

Plaintiff admitted to withdrawing funds to pay the mortgage. She claims Defendant gave permission for the same. Defendant denied giving permission. Generally if parties use marital funds to pay on a separate debt, then the Court will require them to reimburse the spouse for such monies. However, in this case the marital funds (monies) were used to pay a martial debt (mortgage). Since the mortgage is a marital obligation, it is not clear what, if any order, the Defendant is claiming was violated by Plaintiff removing said funds.

### Ruling

All of Defendant's motions are found to be not well taken and denied. Any request for attorney fees for the purported contempt is also denied.

50

## E. Parenting Seminar

The Court finds the parties failed to complete the parenting seminar ("Helping Children Succeed After Divorce") as required by Local Rule 12. Each party will have thirty (30) days from the Decree to complete the same and provide proof to the Court.

*IT IS SO ORDERED.*

D. Frost
DUKE FROST, JUDGE

cc:
SARA N. WILCOX, PLAINTIFF
HERBERT W. BAKER, ATTORNEY FOR THE PLAINTIFF
GRANT T. WILCOX, DEFENDANT
DAVID B. STOKES, ATTORNEY FOR THE DEFENDANT
LICKING COUNTY CSEA

IN COMPLIANCE WITH CIVIL RULE 58, IT IS
VERIFIED THAT COPIES HAVE BEEN SENT TO THE
PARTIES AND/OR THEIR ATTORNEY OF RECORD IN
A MANNER PRESCRIBED BY CIVIL RULE 5(B) ON
THIS 23rd DAY OF March , 20 17 .

M Abbey

51

# IN THE LICKING COUNTY COURT OF COMMON PLEAS, NEWARK, OHIO
## DIVISION OF DOMESTIC RELATIONS
### CHILD SUPPORT COMPUTATION SUMMARY WORKSHEET - SOLE RESIDENTIAL PARENTING ORDER

| Case No: | 2015 DR 00574 | Judge | Duke Frost | Number of Children of of Marriage Residing With Each Party | Number of "Other" Children of the Party Residing With Party | SETS No: | |
|---|---|---|---|---|---|---|---|
| | | | | 1 | 0 | | |
| Names of Parties: | Sara N Wilcox | | | 0 | 0 | Worksheet Created: | 03/13/2017 |
| | Grant T Wilcox | | | | | Calc. Date Date: | 03/13/2017 |

| [T] 00 - 00 - 00 - 00 - 00 - 00 - 0 | FATHER | MOTHER |
|---|---|---|
| 1a. Gross Income from Employment | $ 16,848.00 | $ 17,300.00 |
| 1b. Overtime and Bonuses | $ 0.00 | $ 0.00 |
| 2. Self-Employment Income | $ 0.00 | $ 0.00 |
| 3. Interest and Dividends | $ 0.00 | $ 0.00 |
| 4. Unemployment Comp. | $ 0.00 | $ 0.00 |
| 5. Workers' Comp./Dis. Ins. | $ 0.00 | $ 0.00 |
| 6. Other Income (taxable) | $ 0.00 | $ 0.00 |
| 6. Other Income (non-taxable) | $ 0.00 | $ 0.00 |
| 7a. Total Annual Gross Income | $ 16,848.00 | $ 17,300.00 |
| 7b. Health Insurance Maximum | $ 842.40 | $ 865.00 |
| 8. Resident Children Adj. | $ 0.00 | $ 0.00 |
| 9. Other Child Support Paid | $ 0.00 | $ 0.00 |
| 10. Spousal Support Paid | $ 0.00 | $ 0.00 |
| 11. Local Taxes Payable | $ 336.96 | $ 346.00 |
| 12. Work-related Deductions | $ 0.00 | $ 0.00 |
| 13. Total Income Adjustments | $ 336.96 | $ 346.00 |
| 14a. Adjusted Gross Income | $ 16,511.04 | $ 16,954.00 |
| 14b. Cash Medical Support Max. | $ 0.00 | $ 0.00 |
| 15. Combined Annual Income | | $ 33,465.04 |
| 16. % Each Party's Inc to Total Inc. | 49.34 % | 50.66 % |
| 17. Basic C/S Obligation | | 5,835.23 |
| 18. Annual Support per Parent | $ 2,879.10 | $ 2,956.13 |
| 19. Net Child Care Exp. Paid | $ 0.00 | $ 0.00 |
| 20a. Health Insurance Expense | $ 0.00 | $ 0.00 |
| 20b. Cash Medical Support Obligation | $ 0.00 | $ 0.00 |

#### OBLIGATION WHEN HEALTH INSURANCE IS PROVIDED

| | | |
|---|---|---|
| 21. Adjustment Additions | $ 0.00 | $ 0.00 |
| 21. Adjustment Subtractions | $ 0.00 | $ 0.00 |
| 22. Obl. After Adjustments | $ 2,879.10 | $ 2,956.13 |
| 23a. Obligor's Obligation | | $ 2,879.10 |
| 23b. Benefits Received for Child | | $ 0.00 |
| 23c. Actual Annual Obligation | | $ 2,879.10 |
| 27. Deviation Adjustment | | $ 0.00 |
| 27. Support Figure W/Health Ins. | | $ 2,879.10 |

#### OBLIGATION WHEN HEALTH INSURANCE IS NOT PROVIDED

| | | |
|---|---|---|
| 24. Adjustment Additions | $ 0.00 | $ 0.00 |
| 24. Adjustment Subtractions | $ 0.00 | $ 0.00 |
| 25. Obl. After Adjustments | $ 2,879.10 | $ 2,956.13 |
| 26a. Obligor's Obligation | | $ 2,879.10 |
| 26b. Benefits Received for Child | | $ 0.00 |
| 26c. Actual Annual Obligation | | $ 2,879.10 |
| 27. Deviation Adjustment | | $ 0.00 |
| 28. Support Figure W/O Health Ins. | | $ 2,879.10 |

| Household Inc. After Child Support | $ 13,631.94 | $ 19,833.10 |
|---|---|---|

| FINAL CHILD SUPPORT FIGURE | FINAL CASH MEDICAL FIGURE | |
|---|---|---|
| With Health Ins. $ 2,879.10 | Actual Cash Medical Obl. $ | 0.00 |
| Without Health Ins. $ 2,879.10 | Deviation Adjustment $ | 0.00 |
| | Final Cash Medical Obl. $ | 0.00 |
| C/S Obligor: Father | CMS Obligor: Father | |

| c/s per mo. with health ins. | | C/S Per Mo. W/O Health Ins. | | Cash Medical |
|---|---|---|---|---|
| Per Child | Children | Per Child | Children | Per Month |
| $ 239.92 | $ 239.92 | $ 239.92 | $ 239.92 | $ 0.00 |
| $ 4.80 | $ 4.80 | $ 4.80 | $ 4.80 | $ 0.00 |
| $ 244.72 | $ 244.72 | $ 244.72 | $ 244.72 | $ 0.00 |

| Bonus & Overtime | FATHER | | MOTHER | |
|---|---|---|---|---|
| 3 Years ago Amount: | $ | 0.00 | $ | 0.00 |
| 2 Years ago Amount: | $ | 0.00 | $ | 0.00 |
| 1 (Last Year's Amount) | $ | 0.00 | $ | 0.00 |
| Average of 3 Years: | $ | 0.00 | $ | 0.00 |

| Self -Employment Income | | | | |
|---|---|---|---|---|
| Gross Receipts | $ | 0.00 | $ | 0.00 |
| Expenses | $ | 0.00 | $ | 0.00 |
| 5.6% or F.I.C.A. Diff | $ | 0.00 | $ | 0.00 |
| Adj. SE Income | $ | 0.00 | $ | 0.00 |

| Resident Children Exemption(s) Adjustment | | | | |
|---|---|---|---|---|
| No. of "Other" Children: | | 0 | | 0 |
| Amt. Fed Exemptions: | $ | 0.00 | $ | 0.00 |
| Amt. State Exemptions: | $ | 0.00 | $ | 0.00 |
| Child Support Rec'd | $ | 0.00 | $ | 0.00 |
| Net Other Children Adj. | $ | 0.00 | $ | 0.00 |

| Local Income Tax | | | | |
|---|---|---|---|---|
| Rate of Local Tax: | | 2.000 % | | 2.000% |
| Calculated Amt. of Tax: | $ | 336.96 | $ | 346.00 |
| Entered Amt of Tax: | $ | 0.00 | $ | 0.00 |
| Amount of Tax Used: | $ | 336.96 | $ | 346.00 |

| Child Care Credit | | | | |
|---|---|---|---|---|
| Actual Expense | $ | 0.00 | $ | 0.00 |
| Fed.Tax Credit | $ | 0.00 | $ | 0.00 |
| State Tax Credit | $ | 0.00 | $ | 0.00 |
| Net Expe. After Credit | $ | 0.00 | $ | 0.00 |

| Health Insurance Expense | | | | |
|---|---|---|---|---|
| 150% Poverty Level | $ 17,820.00 | | | |
| Health Ins. Expense | $ | 0.00 | $ | 0.00 |
| USDA Cash Med. Figure | $ | 990.00 | $ | 990.00 |
| Family Coverage Expense | $ | 0.00 | $ | 0.00 |
| Individual Expense | $ | 0.00 | $ | 0.00 |
| Net Expense | $ | 0.00 | $ | 0.00 |
| Actual Health Exp. Adj | $ | 0.00 | $ | 0.00 |

| Support Table | INCOME | | SUPPORT | |
|---|---|---|---|---|
| Higher Figure | $ | 33,600.00 | $ | 5,853.00 |
| Actual Figure | $ | 33,465.04 | $ | 5,835.23 |
| Lower Figure | $ | 33,000.00 | $ | 5,774.00 |

**Supportworks**
Child Support Guideline
Worksheet Program
Version 6.0.08+ (c) 2000-17
01/01/2017
Piper Software Productions, Inc.
WWW.SUPPORTWORKS.NET

| Prepared by: Court |
|---|
| Duke Frost |
| Preparer's Firm or Organization |
| Preparer's Address Data |
| Preparer's Address Data |
| Preparer's Address Data |
| Preparer's Address Data |

| Plaintiff: Sara N Wilcox | Date |
|---|---|
| Defendant: Grant T Wilcox | Date |

**EXHIBIT E**

# Consolidated Retirement Account Statement

GRANT T
WILCOX



## Summary for April 1, 2017 - June 30, 2017

### ArcBest Corporation

| | | Ending Balance |
|---|---|---|
| _____ 401(k) Plan | ABF Freight System, Inc. | $845.83 |
| Total | | $845.83 |

| | |
|---|---|
| Beginning Balance—All Accounts | $27,085.36 |
| Money In | $0.00 |
| Your Contributions | |
| Money Out | -$26,747.35 |
| Withdrawals | |
| Credits/Fees | -$10.81 |
| Gain/Loss | $518.63 |
| Ending Balance—All Accounts | $845.83 |
| Vested Balance | $845.83 |

### Personalized Rate of Return—All Accounts

| 3 Mo. | YTD | 1 Yr. | 3 Yr. | 5 Yr. |
|---|---|---|---|---|
| 3.45% | 10.13% | 22.82% | 7.94% | 10.30% |

**Your Personal Rate of Return (PRR)** represents the specific performance of the investment choices you have selected. The PRR calculates the percentage change of your account balance by weighting all activity included in the time period measured. It includes your investment earnings during the period and is net of plan fees and credits. Indicated returns are annualized when performance of one year or greater is shown.

This statement has been carefully prepared to ensure it is accurate and up-to-date. Should you find any discrepancies, please let us know in writing within 30 days. Please direct any concerns to Transamerica by calling the phone number on this statement or signing into your account at arcbest.trsretire.com and clicking "Help".

### Your Investment Allocations —All Accounts



**Current Allocations**
How your current account balance is spread among investment types

14%
86%

Bonds*
Stocks

**Future Allocations**
How your future contributions will be allocated among investment types

14%
86%

*Includes stable value and money market

### Your Retirement Outlook® as of 06/16/17



Cloudy

A cloudy forecast means your current strategy is likely to produce retirement income that meets 65% - 79.9% of your goal.

| | Monthly | Yearly |
|---|---|---|
| Estimated Income, including estimated Social Security | $1,450.00 | $17,400.00 |
| Income Goal | $2,133.33 | $25,600.00 |
| Estimated Income Gap | -$683.33 | -$8,200.00 |

**Improve Your Retirement Outlook today!**

IMPORTANT: The projections or other information generated by the engine regarding the likelihood of various investment outcomes are hypothetical, do not reflect actual investment results, and are not guarantees of future results. Results derived from the tool may vary with each use and over time. Please visit your plan website for more information regarding the criteria and methodology used, the engine's limitations and key assumptions, and other important information.

Contact Us:
800-755-5801
arcbest.trsretire.com

See other pages for definitions and explanations.

**TRANSAMERICA**

**Introducing Transamerica Voice Pass**
Making a phone call might not seem innovative, but we're raising the bar on where innovation can live. Transamerica Voice Pass, our new voice-recognition system, can provide security and convenience without having to remember a password when you call our Customer Care team. Voice Pass will identify you based on a stored voiceprint, which is as unique as your fingerprint. There's a short set-up process to get started. Once set up, all you'll need to do when you call is repeat the phrase: "At Transamerica, my voice is my password" to access your account.

**Download the My TRSRetire App Today!**
Managing your retirement account has never been easier. Get the latest information right from your smartphone or tablet. Download the app today in the Apple App Store or on Google Play.